**Sheldon SANDERS, Petitioner–Appellant,**

v.

**John RATELLE, Warden; Daniel E. Lungren, Attorney General of the State of California, Respondents–Appellees.**

No. 93–55134.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted October 8, 1993.

Decided April 4, 1994.

Rowan K. Klein, Klein & Crain, Santa Monica, CA, for petitioner-appellant.

Joseph P. Furman, Deputy Atty. Gen., Sharon Wooden Richard, Deputy Atty. Gen., Los Angeles, CA, for respondents-appellees.

Before REINHARDT, T.G. NELSON, Circuit Judges, and KAUFMAN, Senior District Judge.*

Part I of the opinion by Senior District Judge KAUFMAN; Part II by Judge REINHARDT.

All members of the court join in all three parts of the opinion.

KAUFMAN, Senior District Judge, delivered Part I of the opinion of the court.

REINHARDT, Circuit Judge, delivered Part II of the opinion of the court.

I

Sheldon Sanders appeals the district court's denial of his 28 U.S.C. § 2254 petition for a writ of habeas corpus. Sheldon[1] was convicted in a second trial in the Superior Court of Los Angeles County, California, of second-degree murder[2] and of illegal use of a firearm,[3] after his first trial in that court had resulted in a hung jury. Sheldon, in the federal district court below, asserted that he

---

* The Honorable Frank A. Kaufman, Senior United States District Judge for the District of Maryland, sitting by designation.

1. For ease of reference, and in order to distinguish among the various members of the family, the Sanders brothers are sometimes referred to by their given names.

2. Cal.Penal Code §§ 187, 189.

3. Cal.Penal Code §§ 12022.5, 1203.06(a)(1).

had received ineffective assistance of counsel in violation of his Sixth Amendment rights. U.S. Const. amend. VI. The district court, adopting the Report and Recommendation of a U.S. Magistrate Judge, denied petitioner's writ. Thereafter, Sheldon appealed to this Court. Because his attorneys during both trials were faced with impermissible conflicts of interest, which adversely affected their representation of Sheldon, we remand the within case to the district court with directions to issue the writ of habeas corpus sought by Sheldon.

## FACTS

This case arises from the murder of Norman Gregory on July 11, 1985, in Compton, California. Although the events of that day have been, to some extent, obscured by conflicting accounts and the passage of time, the following rather clear picture has emerged.[4]

In 1985, Kelvin Sanders, Sheldon's brother, was estranged from his wife, Reynetta Gregory Sanders. As a result of that estrangement, Reynetta resided at the Gregory family residence with her brother, Norman, among others. On the morning of July 11, 1985, Kelvin Sanders was at the Gregory residence, apparently having spent the previous night there. At approximately 10 a.m., Sheldon arrived to pick up Kelvin. Sheldon was driving a burgundy BMW which belonged to his sister, Sheree, but which Xavier, another brother, apparently often drove. Sometime prior to the departure of Sheldon and Kelvin, they became embroiled in an altercation with two of Reynetta's brothers, Norman and David Gregory. Though none of the combatants suffered any injury, a stone allegedly thrown by one of the Gregory brothers struck and cracked the windshield of the BMW.

Shortly after those events occurred, Reynetta received two brief telephone calls from Kelvin warning her to leave the house. Presumably in response to the warnings, she dressed her children and went next door. Reynetta testified that, approximately fifty minutes after Sheldon had departed the

Gregory residence, and twenty minutes after she had left that residence to go to a neighbor's home, she heard a loud "bang" outside and ran out of that neighbor's house into the street.

At the same time, Norman, David and Terrell Gregory, along with their friends, William Thomas and Darryl Anderson, all of whom had been inside the Gregory residence, ran to the front door and crowded around the doorway to observe what had happened. The outside, wooden front door was open. As they peered out at the street through a second, inner, screened and barred security door, they observed a man standing in the street with a rifle. The witnesses in the doorway disagree as to whether the man fired two or three shots from the rifle. There is no doubt, however, that one of the gunshots fatally wounded Norman Gregory, entering the back of his neck and exiting his left jaw. He died a few days later.

When first interviewed by the police, one of the four surviving witnesses who had been standing at the door, Terrell Gregory, identified the assailant as "Zuba," a nickname for Xavier Sanders. A second witness, Darryl Anderson, initially informed police that the guilty party was "Kake," a nickname for Sheldon; however, the next day Anderson told the police that "Zuba" was the shooter. Another witness, David Gregory, consistently has identified Sheldon as the perpetrator. A fourth witness, William Thomas, first told the police that the assailant was "Kake," but later stated to the police that he was not sure who had fired the fatal shot. Reynetta Sanders, who seems to have possessed an unobstructed vantage from the property of one of the neighbors of the Gregorys, originally told police that the assailant was Xavier, not Sheldon, although she later testified at both trials that she saw Sheldon with the rifle. All of the other witnesses also testified at the trials that Sheldon was the man who they saw fire the shots.

Sheldon was arrested at his parents' home on July 12, 1985. Xavier, informed that the

4. The bulk of the facts recited in this opinion is drawn from the majority and dissenting opinions from the California Court of Appeal. *See People*

*v. Sanders,* 221 Cal.App.3d 350, 271 Cal.Rptr. 534 (1990).

police were looking for him as well, then hired an attorney, paid an agreed retainer, and confided to him that he, Xavier, not Sheldon, had shot Norman Gregory and that, at the time of the shooting, he was accompanied by Sheldon and Kelvin. The attorney advised Xavier to report to the police but to assert his Fifth Amendment rights and to refuse to divulge any information. Upon Xavier's release from custody and the decision of the police not to press charges against him, the same attorney assumed representation of Sheldon. Apparently, the attorney informed Xavier that the retainer already paid by the latter would be considered as paid on behalf of Sheldon. Sheldon, as well as his mother and his father, assumed responsibility for subsequent fees to be paid to the attorney during the course of his representation of Sheldon.

Prior to the first trial, Xavier's mother informed the attorney that Xavier told her, on the night of the shooting, that he (Xavier) had shot Gregory. During Sheldon's first trial, the attorney subpoenaed Xavier to testify but, according to Xavier, when he arrived at the courthouse, the attorney advised him to "take the [F]ifth" despite Xavier's expressed willingness to testify that he, not Sheldon, had shot Norman Gregory. The trial resulted in an evenly split jury, a mistrial was declared, and a second trial was scheduled.

After the mistrial, Sheldon's parents dismissed the first attorney and retained Philip Jefferson [5] to represent Sheldon during the second trial. Sheldon's first attorney provided Jefferson, *inter alia*, with the police reports which had been received in discovery in preparation for the first trial. Prior to the second trial, Regina Sanders, who is Sheldon and Xavier's mother, came with Xavier to Jefferson's law office. She informed Jefferson of Xavier's confession to her and of his willingness to talk with Jefferson about his shooting of the victim. Subsequently, during the second trial, Xavier came to the court-

room, purportedly ready to testify that he had fired the fatal shot, but, upon being instructed by Jefferson to leave, Xavier departed without testifying.

In connection with the second trial, Jefferson pursued three defenses on behalf of Sheldon. First, he offered alibis to show that Sheldon was not at the scene of the crime. Second, he contended that the shot which had killed Norman Gregory was fired from inside the Gregory house, not from the street where witnesses placed Sheldon and his brother, Xavier. Lastly, relying on conflicting accounts of eyewitnesses who variously had identified Xavier or Sheldon as the shooter, Jefferson claimed that Xavier, not Sheldon, shot Gregory.

The juries, during the first and second trials, never had the opportunity to hear Xavier testify and never learned of Xavier's statement to his mother on the night of the shooting that he was the shooter. At the close of the second trial, the jury convicted Sheldon of second-degree murder and illegal use of a firearm. Thereafter, Sheldon was sentenced to seventeen years to life.

After the second trial, the Sanders family discharged Jefferson and retained a third attorney, Leslie Abramson. Abramson unsuccessfully filed a petition for habeas corpus relief in the Superior Court of Los Angeles County, California. The judge sitting in that court, who subsequently served as the referee in a later evidentiary hearing, denied relief to Sheldon. On appeal, the California Court of Appeal, while ultimately affirming the denial of state habeas corpus relief, ordered the appointment of a referee to take evidence and to make findings concerning competency of counsel. The judge (referee) then appointed a new attorney, Rowan Klein, to represent Sheldon in the ensuing evidentiary proceeding. Jefferson, whose conduct formed the principal focus of the hearing, was unavailable to testify.[6] Klein introduced

---

**5.** Jefferson since has been disbarred for a variety of ethical lapses and instances of professional misconduct. *See* note 6, *infra*.

**6.** Judge Johnson, in dissent in the California Court of Appeal in this case, noted that at the time of the hearing Jefferson "had left the state

after accepting inactive status when the State Bar recommended him for disbarment due to a 10-year pattern of misconduct as an attorney." *Sanders,* 271 Cal.Rptr. at 552 (Johnson, J., dissenting).

a tape-recorded conversation between Xavier and Klein, in which Xavier admitted that he (Xavier) had fired the rifle. Xavier, who testified in person, repeated during that hearing most of the information conveyed on that tape but refused to answer questions as to whether he had fired the gun.

Upon the conclusion of the hearing, the referee found no tangible evidence of incompetence of counsel or prejudice and denied the state habeas corpus petition. The California Court of Appeal, in a lengthy opinion, adopted the referee's findings and affirmed the judgment by a vote of 2 to 1, over a forceful, and in this Court's view, a very convincing dissent. The California Supreme Court denied review.

On January 17, 1991, Sheldon filed a federal habeas corpus petition in the court below, pursuant to 28 U.S.C. § 2254. U.S. Magistrate–Judge King conducted an evidentiary hearing on February 19, 1992, after repeated unsuccessful attempts by Klein and an investigator to locate Jefferson. In his federal petition, Sheldon contends that he was not afforded effective assistance of counsel due to Jefferson's failure to speak with Xavier or to seek to introduce Xavier's testimony at trial, failure to obtain a transcript of the first trial and have the same available for use during the second trial, failure to perform other tasks expected of reasonably competent counsel, and Jefferson's alleged conflict of interest.

Magistrate–Judge King, in his Report and Recommendation filed July 17, 1992, determined that Sheldon had failed to demonstrate deficient performance by counsel, or prejudice resulting from any such deficiency, or conflict of interest. Specifically, the magistrate judge wrote that he was convinced "to a reasonable certainty that Xavier would not have testified even if called," and noted that

in his view the "Court of Appeal's decision that ... [Regina Sanders' testimony regarding Xavier's confession] was inadmissible under state law is determinative of our inquiry." · The magistrate judge concluded that petitioner had "failed to show that the state courts would have admitted" either the mother's testimony concerning what Xavier had told her, or a recorded statement by Xavier had one been obtained by Jefferson. Accordingly, the magistrate judge recommended denial of Sheldon's federal habeas corpus quest for relief.

On August 31, 1992, the district court adopted the "findings, conclusions, and recommendations" of the report of the magistrate judge and dismissed Sheldon's action on the merits. Sheldon then filed a timely notice of appeal to this Court.

## STANDARD OF REVIEW

 Federal appellate courts review grants or denials of habeas corpus relief *de novo*. E.g., *Reiger v. Christensen*, 789 F.2d 1425, 1427 (9th Cir.1986). In a federal habeas action, a claim of ineffective assistance of counsel, and/or of conflict of interest on the part of counsel, presents "mixed question[s] of fact and law" and receives *de novo* review. See *Strickland v. Washington*, 466 U.S. 668, 698, 104 S.Ct. 2052, 2069, 80 L.Ed.2d 674 (1984); *Mannhalt v. Reed*, 847 F.2d 576, 579 (9th Cir.), *cert. denied*, 488 U.S. 908, 109 S.Ct. 260, 102 L.Ed.2d 249 (1988); *Reiger*, 789 F.2d at 1427–28. Of course, "state court findings of fact made in the course of deciding an ineffectiveness claim are subject to the deference requirement of [28 U.S.C.] 2254(d)," *Strickland*, 466 U.S. at 698, 104 S.Ct. at 2070, and are presumed to be correct unless they fall within one of the eight exceptions listed in 28 U.S.C. § 2254(d).[7] Like-

---

7. Those exceptions apply if the petitioner establishes, or the respondent admits, one of the following:

(1) that the merits of the factual dispute were not resolved in the State court hearing;
(2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;
(3) that the material facts were not adequately developed at the State court hearing;

(4) that the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceeding;
(5) that the applicant was an indigent and the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding;
(6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or

wise, a federal district court's findings and its adoption of the findings of a federal magistrate judge are reviewed under the clearly erroneous standard prescribed by Fed. R.Civ.P. 52(a). *See Strickland,* 466 U.S. at 698, 104 S.Ct. at 2070; *Carter v. McCarthy,* 806 F.2d 1373, 1375 (9th Cir.1986), *cert. denied,* 484 U.S. 870, 108 S.Ct. 198, 98 L.Ed.2d 149 (1987).

## CONFLICT OF INTEREST

### A. General

In order "[t]o establish a sixth amendment violation based on a conflict of interest [a federal habeas petitioner] must show 1) that counsel actively represented conflicting interests, and 2) that an actual conflict of interest adversely affected his lawyer's performance." *Mannhalt,* 847 F.2d at 579 (citing *Cuyler v. Sullivan,* 446 U.S. 335, 348, 350, 100 S.Ct. 1708, 1718, 1719, 64 L.Ed.2d 333 (1980)).

■ Once an actual conflict has been demonstrated, prejudice is presumed since the harm may not consist solely of what counsel does, but of "what the advocate finds himself compelled to *refrain* from doing, not only at trial but also" during pretrial proceedings and preparation. *Holloway v. Arkansas,* 435 U.S. 475, 490, 98 S.Ct. 1173, 1181, 55 L.Ed.2d 426 (1978); *see also, e.g., Strickland,* 466 U.S. at 692, 104 S.Ct. at 2067; *United States v. Miskinis,* 966 F.2d 1263, 1268 (9th Cir.1992); *Fitzpatrick v. McCormick,* 869 F.2d 1247, 1251–52 (9th Cir.), *cert. denied,* 493 U.S. 872 (1989). A requirement of the showing of prejudice "would not be susceptible of intelligent, even-handed application," *Holloway,* 435 U.S. at 490, 98 S.Ct. at 1182, as "it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests." *Strickland,* 466 U.S. at 692, 104 S.Ct. at 2067.

■ An actual conflict, as opposed to the "mere possibility of a conflict," is necessary to establish ineffective assistance. *Morris v.*

*California,* 966 F.2d 448, 455 (9th Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 96, 121 L.Ed.2d 57 (1992). Such conflict "must be proved through a factual showing on the record." *Id.* In the instant case, as far as this Court knows, Jefferson never has explained his actions to anyone—with the exception of his brief comments to Abramson, *see infra*—leaving the parties and the courts to ascribe to him a variety of motivations, all based, to varying degrees, upon supposition, a number of which strongly suggest that Jefferson simultaneously was trying to protect Xavier and to defend Sheldon.

■ The existence of an actual conflict cannot be governed solely by the perceptions of the attorney; rather, the court itself must examine the record to discern whether the attorney's behavior seems to have been influenced by the suggested conflict. *Cf. Fitzpatrick,* 869 F.2d at 1252–53 (after the court's review of the trial proceedings, the court concluded that there was an actual conflict (despite counsel's protestations that his actions stemmed from ethical considerations) and that "his performance· in Fitzpatrick's trial" was "affected" by his "attorney-client relationship" with a third party and "communication" from the latter "which he protected").

■ Once a federal habeas petitioner has shown the existence of an actual conflict, he need demonstrate only "that some effect on counsel's handling of particular aspects of the trial was 'likely.'" *Miskinis,* 966 F.2d at 1268 (citing *Mannhalt,* 847 F.2d at 583). In *Miskinis,* one of the factors which the court described as evincing such an adverse effect was the possibility that the attorney's failure to allow his client to testify at trial was due to the fact that the client might incriminate the attorney as having breached "the rules of professional ethics." *Id.* at 1269. Courts also have detected adverse effects where a conflict may have impacted "[t]he manner of

(7) that the applicant was otherwise denied due process of law in the State court proceeding;
(8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of

the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record: ...
28 U.S.C.A. § 2254(d) (West 1991).

the cross-examination" by the attorney, *Mannhalt*, 847 F.2d at 582, and where counsel "failed to present evidence which, if offered, might have put enough uncertainty into the minds of the jury as to undermine a conviction beyond a reasonable doubt that [petitioner] committed the murder." *Fitzpatrick*, 869 F.2d at 1252.

### B. Counsel At the First Trial

■ A review of the record reveals that Sheldon has not, in the district court below or in this Court in writing, expressly charged his first attorney with conflict of interest. The facts of his first attorney's conflict shed light upon attorney Philip Jefferson's conflict in the second trial—and it is Jefferson's conflict which forms the basis of Sanders' habeas claim here. Simply put, the conflict of Sheldon's first attorney led him to pursue Sheldon's weak alibi and "inside shot" defenses and to neglect Sheldon's more credible mistaken identity defense. This, along with Jefferson's own conflict, may have contributed to Jefferson's decision to continue to pursue Sheldon's weakest defenses at the expense of his strongest. In any event, the facts before us relating to the rendition of legal services by Sheldon's first attorney make it impossible in this case for us to do justice and at the same time to ignore the existence of the first attorney's conflict.

Sheldon's first attorney initially was retained by Xavier, Sheldon's brother, in connection with the same incident as that for which petitioner was charged, namely, the shooting of Norman Gregory.

Conflicts of interest can arise both in cases of simultaneous representation and successive representation, though it generally is more difficult to demonstrate an actual conflict resulting from successive representation. *Mannhalt*, 847 F.2d at 580....

... In successive representation, "conflicts of interest may arise if the cases are substantially related or if the attorney reveals privileged communications of the former client or otherwise divides his loyalties." *Mannhalt*, 847 F.2d at 580. Among the dangers in a successive representation situation is that the attorney who has obtained privileged information from the former client may fail to conduct a rigorous cross-examination for fear of misusing that information. *United States v. Agosto*, 675 F.2d 965, 971 (8th Cir.1982).

*Fitzpatrick*, 869 F.2d at 1252. Here, as in *Fitzpatrick*, Sheldon's first attorney successively represented two different clients, each of whom was a prime suspect for the role of the killer. It is true that Sheldon's first attorney only served as counsel for Xavier for a brief period; however, if, during that brief time, Xavier indeed confided his guilt to the attorney, then the question arises as to whether the attorney subsequently was incapable of mounting an adequate defense on behalf of Sheldon.

The first attorney's transfer of Xavier's retainer, with the latter's approval, for use in the defense of Sheldon raises a further question as to which master Sheldon's first attorney felt bound to serve. Nor does the fact that one or both of Sheldon's parents may have assumed responsibility for all or some of the remainder of the first attorney's fee alleviate this concern. Indeed, it is not hard to imagine the potential for conflicting pressures upon an attorney from parents concerned with protecting not only one, but two of their sons, even though the record itself gives no actual indication of Sheldon's first attorney having been subjected to any such pressure.

In this case, the adverse impact upon Sheldon of his first attorney's conflicting loyalties is strongly indicated by that attorney's advice to Xavier to assert his Fifth Amendment right not to testify during Sheldon's trial. Thus, in effect, Sheldon's first attorney counseled a key—perhaps *the* key—witness not to offer testimony which seemingly would have exculpated his client, the defendant, Sheldon. Such behavior could have stemmed from the first attorney's continuing sense of obligation to Xavier. But such conduct, if it in fact occurred for that reason, clearly violated that attorney's duty to Sheldon. And, of course, that is true even if the attorney concluded that he (the attorney) could "have his cake and eat it, too," by arguing Xavier's guilt to the jury in an attempt to exonerate Sheldon while at the same time preventing Xavier

from incriminating himself. Indeed, Sheldon's first attorney partially succeeded during the first trial in accomplishing just that, by gaining an evenly split jury and consequent mistrial for Sheldon and keeping Xavier from incriminating himself.

## C. Counsel at the Second Trial

Jefferson's conduct of the case must be reviewed in the context of the first trial and what Sheldon's first attorney did therewith. To begin, when Sheldon's first attorney elected to spare Xavier from testifying in favor of an argument that Sheldon was not at the site of the shooting, he left the second defense lawyer with severely circumscribed choices, if the lawyer knew all the facts. If Xavier testified in the second trial that he was the shooter, it would undercut the alibi defense since Xavier said one of the people with him was Kelvin, who was an alibi witness at the first trial. The other person with Xavier was Sheldon, who was home playing cards according to the alibi witnesses. The carry-over effect of the first attorney's refusal to call Xavier as a witness during the first trial prejudiced Sheldon at the second trial by making it difficult to pursue that defense.

Further, Jefferson did not even interview Xavier in order to ascertain the content and veracity of Xavier's story or to determine whether Xavier would have been willing to testify during the second trial. Consequently, Jefferson did not know that Xavier's story would contradict the alibi defense. Even if Jefferson was fully aware of Xavier's confession, he should have spoken directly with Xavier in order to obtain potentially helpful details of the incident and to explore Xavier's willingness to testify.[8] Also, Jefferson should have asked Xavier to record a statement confessing to the murder, or at least discussing the incident, as Klein later did.[9]

As respondent has suggested, Jefferson may have shied away from calling Xavier to testify during the second trial because he (Jefferson) was fearful that Xavier would have lied on the witness stand in order to help Sheldon. If so, after interviewing Xavier, Jefferson could have decided what he, as an attorney, then was required to do or not to do. That is particularly true in the face of Mrs. Sanders' seemingly simple and unequivocal statement to Jefferson that Xavier had

---

[8]. It is noted that the U.S. magistrate judge, in a finding of fact adopted by the district court, concluded that Xavier would not have testified, in any event. *But see* note 13, *infra.* Even assuming, *arguendo* only, that to be true, Jefferson, at the very least, should have attempted to obtain such testimony. We need not consider whether the magistrate judge's finding of fact presents difficulties for Sheldon in the context of prejudice because if, in fact, Jefferson had an actual conflict of interest in this case, prejudice is presumed. *See Holloway,* 435 U.S. at 490, 98 S.Ct. at 1181. Additionally, as a matter of common sense, there can be no doubt that Jefferson should have interviewed Xavier irrespective of his purported confession, simply as one of the key eyewitnesses to the incident. *See Hoots v. Allsbrook,* 785 F.2d 1214, 1219–20 (4th Cir.1986) (failure to interview eyewitnesses to a crime constituted deficient performance).

[9]. The California Court of Appeal adopted the referee's equivocal determination that Xavier's statements, and Regina Sanders' testimony regarding her son's confession to her, most likely would not have been admissible. *See Sanders,* 271 Cal.Rptr. at 542. We are bound by that state court's evidentiary ruling unless it is "untenable or amounts to a subterfuge to avoid federal review of a constitutional violation." *Oxborrow v. Eikenberry,* 877 F.2d 1395, 1399 (9th Cir.), *cert.*

*denied,* 493 U.S. 942, 110 S.Ct. 344, 107 L.Ed.2d 332 (1989). This vital evidence implicates *Chambers v. Mississippi,* 410 U.S. 284, 302–03, 93 S.Ct. 1038, 1049–50, 35 L.Ed.2d 297 (1973), where Justice Powell wrote:

> [T]he exclusion of ... critical evidence [on evidentiary grounds], coupled with the State's refusal to permit [defendant] to cross-examine [a key witness], denied [defendant] a trial in accord with traditional and fundamental standards of due process. In reaching this judgment, we establish no new principles of constitutional law. Nor does our holding signal any diminution in the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures. Rather, we hold quite simply that under the facts and circumstances of this case the rulings of the trial court deprived [defendant] of a fair trial.

*See also* note 14, *infra.*

In the within case, Jefferson, at the least, should have tried to introduce, during the second trial, live or taped testimony of Xavier, or the testimony of the mother of Sheldon and Xavier as to what Xavier told her and what she told Jefferson. In that context, in the subsequent state habeas corpus proceeding, Abramson, as former counsel for Sheldon, did relate certain statements made to her by Jefferson.

told her that he, Xavier, not Sheldon, had fired the rifle.

The key question, if any, left open at the first trial was whether or not Sheldon was the shooter, not whether or not Sheldon was present. The alibi defense pursued by Jefferson, under those circumstances, was not very persuasive, and the defense that Xavier was the shooter obviously would have been more effective if Xavier himself so had testified. Thus, Jefferson's failure to interview Xavier prevented Jefferson from learning of all possible facts which would have been helpful to the defense in the second trial, both with regard to the identity of the shooter and in exposing the weakness of the alibi defense. In that context, we cannot credit Jefferson with making a sound tactical choice not to call Xavier as a witness in the second trial. Only the tug of conflicting interests of the various members of the Sanders family reasonably can explain that decision. Jefferson, in our view, was dominated by loyalties to Xavier and to the family.

During the state habeas evidentiary proceeding, Abramson, former counsel for Sheldon, offered testimony regarding statements allegedly made to her by Jefferson. Those statements were admitted by the referee over the hearsay objection of the government.[10] According to testimony offered into evidence during the state habeas evidentiary proceeding, Jefferson told Abramson, after she reminded Jefferson that he was not representing Xavier during the trial, that he "didn't see any reason to get Xavier involved" and felt he was "representing the family." The short answer to that remark is that, regardless of any sense of obligation by Jefferson to Xavier and/or to the Sanders family, if that impulse impeded his vigorous, undiluted representation of Sheldon, Jefferson had no choice but to respect and perform his duty to Sheldon.[11] That is particularly true in this case, in which the record includes evidence making it quite probable that, in fact, Xavier committed the murder. While

Xavier's testimony might have damaged Sheldon's other defenses by contradicting both Sheldon's "inside shot" defense and the testimony of one or more of Sheldon's alibi witnesses, such potential harm would appear far outweighed by the enormous need to present the testimony of a witness who specifically claimed responsibility for the murder. Under the circumstances of this case, we cannot avoid the conclusion that Jefferson's representation of Sheldon was adversely affected by the conflicts of interest which faced Jefferson, as well as by those facing Bledstein.

### D. Summary

We are confronted here with that rare case in which a petitioner has demonstrated a substantial possibility of actual innocence. Petitioner's two trial attorneys were each subject to and displayed substantial conflicting loyalties which impaired their representations of Sheldon Sanders. While the conflict of Sheldon's first attorney played a part in connection with the second trial, since it was an element of the historical scene which faced Jefferson when he entered the case, it is Jefferson's role on which we principally focus in deciding to grant federal habeas relief to Sheldon Sanders.

### II

Our decision to grant habeas relief is also based on a second and independent ground— ineffective assistance of counsel. Jefferson's representation of Sheldon evidenced a gargantuan indifference to the interests of his client and clearly prejudiced his client's defense. As we stated in Part I, it is quite possible that an innocent man was convicted of murder. It is fortunate that, although murder is a capital offense in California, this appeal does not involve the imposition of the death penalty. It is also fortunate that Sheldon ultimately was afforded the services of a competent lawyer.

---

10. Prior to such admission, the parties had stipulated that Jefferson was unavailable to testify.

11. As noted in note 6, *supra*, Judge Johnson, in dissent at the California Court of Appeal, appended the State Bar of California's record of the

disciplinary actions taken against Jefferson, his disbarment, and various lapses by Jefferson with regard to his ethical duties to his clients. *See Sanders*, 271 Cal.Rptr. at 571.

## INEFFECTIVE ASSISTANCE OF COUNSEL

### A. Failure to Provide Competent Representation

██ Sheldon's brother, Xavier Sanders, confessed on several occasions that he, not Sheldon, was the murderer. These confessions were not belated efforts designed to save a brother who had been convicted. They were made from the very inception of these proceedings, and are all internally consistent. Xavier declared unequivocally that he was the one who shot the deceased.

In spite of Xavier's confession, Sheldon's attorney Philip Jefferson did not interview him. Nor did he call Xavier as a witness during the trial. Nor did he seek to introduce his out-of-court confessions in lieu of testimony. In fact, when Xavier came to Jefferson's office to tell him what had actually happened, Jefferson was not willing to see him or to speak with him—and when Xavier appeared at the trial, possibly to testify, Jefferson directed him to leave the courthouse as quickly as possible.

The Government claims that Jefferson's conduct was not due to incompetence, but the result of Jefferson's "strategic" decision about how best to represent his client, Sheldon. This argument makes little sense: Jefferson failed to conduct even the minimal investigation that would have enabled him to come to an informed decision about what defense to offer and whether to call Xavier as a witness. Describing Jefferson's conduct as "strategic" strips that term of all substance.

██ A lawyer's first duty is zealously to represent his or her client. Given this obligation, Jefferson's refusal even to listen to critical information from a key exculpatory witness regarding the basis of his client's most important defense cannot be deemed a permissible strategy. There is simply nothing in the record, apart from the fact of

Jefferson's incompetence, that suggests even a colorable explanation for his conduct.[12]

Although there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and "[j]udicial scrutiny of counsel's performance must be highly deferential," *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2055, counsel must, at a minimum, *conduct a reasonable investigation* enabling him to make informed decisions about how best to represent his client. *Id.* at 691, 104 S.Ct. at 2066 ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."). Thus, we have found counsel to be ineffective where he neither conducted a reasonable investigation nor made a showing of strategic reasons for failing to do so. *See Hendricks v. Vasquez*, 974 F.2d 1099, 1109 (9th Cir.1992) (vacating the judgment of the district court where it is not possible to "determine if counsel's decision was a strategic one, and, if so, whether the decision was a sufficiently informed one"); *U.S. v. Burrows*, 872 F.2d 915, 918 (9th Cir.1989) (holding counsel's conduct deficient where he failed to investigate a possibility of a mental illness defense and the "district court's assumptions that the attorney must have considered an insanity defense and might have rejected it for strategic reasons appear not to have been based on the record"); *Deutscher v. Whitley*, 884 F.2d 1152, 1160 (9th Cir.1989) (holding that counsel did not make a strategic decision where the defense was based on petitioner's psychiatric problems, yet counsel failed to "even consider investigating evidence which would have bolstered that defense"), *vacated on other grounds,* —— U.S. ——, 113 S.Ct. 367, 121 L.Ed.2d 279 (1992); *Evans v. Lewis*, 855 F.2d 631, 637 (9th Cir.1988) (holding that a failure to investigate a possibility of mental impairment "cannot be construed as a trial tactic" where he did not even bother to view relevant documents that were available).

---

**12.** We leave aside for present purposes the conflict of interest described in Part I. However, even were we to consider that factor here, given Jefferson's history of indifference to his clients' interests (described *infra* at Part II, Section B), we would be required to conclude that while the conflict played a significant role, Jefferson's will-

ful disregard of his professional obligations was nevertheless such as to undermine our confidence in the outcome of the trial and to "prejudice" the defendant, as that term is defined under the second prong of the *Strickland* standard. *See Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064.

Other Circuits agree that the failure to conduct a reasonable investigation constitutes deficient performance. The Third Circuit has held that "[i]neffectiveness is generally clear in the context of complete failure to investigate because counsel *can hardly be said to have made a strategic choice when s/he [sic] has not yet obtained the facts on which such a decision could be made.*" See *U.S. v. Gray,* 878 F.2d 702, 711 (3d Cir.1989). A lawyer has a duty to "investigate what information ... potential eye-witnesses possess[ ], even if he later decide[s] not to put them on the stand." *Id.* at 712. *See also Hoots v. Allsbrook,* 785 F.2d 1214, 1220 (4th Cir.1986) ("Neglect even to interview available witnesses to a crime simply cannot be ascribed to trial strategy and tactics."); *Birt v. Montgomery,* 709 F.2d 690, 701 (7th Cir. 1983), *cert. denied,* 469 U.S. 874, 105 S.Ct. 232, 83 L.Ed.2d 161 (1984) ("Essential to effective representation ... is the independent duty to investigate and prepare.").

Under any of the formulations offered by the circuit courts, Jefferson failed to fulfill his duty to investigate Sheldon's most important defense: that Xavier was the shooter. According to the undisputed evidence in the record, Jefferson not only did not interview Xavier about whether he committed the murder, but he did not seek to question him about his admission to his mother that he fired the shot; nor did he make any effort to ascertain whether Xavier had confessed these same facts to other people whose testimony might be used in the event Xavier ultimately decided to invoke the Fifth Amendment. Jefferson would not even talk to Xavier when the latter came to his office, and peremptorily ordered him to leave when he appeared at the trial. Whatever decision Jefferson might have made about calling Xavier as a witness was not an *informed* one and thus could not be deemed *"strategic."* [13]

Second, Jefferson failed to do what any competent lawyer would do when a witness indicates directly or indirectly that he, and not the lawyer's client, is guilty. He did not attempt to obtain a statement from Xavier confirming his admission of guilt. Had Jefferson done so, he might very well have obtained a confession similar to the written declaration that accompanied the habeas petition to the California Court of Appeals, or the taped interview Xavier voluntarily gave to lawyer Rowan Klein before the state evidentiary hearing. A written or taped statement by Xavier would have provided powerful evidence of Sheldon's innocence, and could have been introduced as a declaration against penal interest, even if Xavier ultimately decided to invoke the Fifth Amendment at the second trial.

Third, Jefferson failed to offer into evidence Xavier's extra-judicial admission that he was the shooter. The court-appointed criminal defense expert at the state evidentiary hearing, Paul Fitzgerald, testified that Xavier's admissions, as well as his potential testimony, constituted a powerful defense and that there was no conceivable strategic or tactical reason not to use this evidence at the second trial.

The defenses used in the second trial were 1) alibi, 2) Gregory was shot from inside the house by an unknown gunman, and 3) mistaken identification. The alibi witnesses offered contradictory testimony and were simply not credible. The "shot from inside the house" theory was even less plausible—the state's ballistics experts made short shrift of this defense when they proved the absence of gunpowder or stipling inside the house. The mistaken identification defense, however, had merit—three of the five eyewitnesses had at one time identified Xavier as the shooter. According to the expert, Fitzgerald, a mistaken identity defense is rarely successful when the accused has a motive, and Sheldon had a motive in this case: he had been assaulted earlier in the day of the murder by

---

**13.** The district court excused Jefferson's failure even to talk to Xavier based on its factual finding that because Xavier had taken the Fifth Amendment at Sheldon's first trial, he would not have testified at the second trial. Even if the factual finding were correct, it would not justify Jefferson's conduct. Moreover, the finding by the district court rests on an extremely shaky legal

footing. Xavier was advised by Sheldon's first attorney not to testify at the first trial. As Part I illustrates, however, the first attorney's advice to Xavier was tainted by his conflict of interest. Accordingly, Xavier's decision to follow the advice of Sheldon's first attorney not to testify at the first trial cannot be taken as proof that he would have refused to testify in the second.

Norman Gregory and one of his brothers. However, unlike in other mistaken identity cases, the "other person" also had a motive—earlier that day the Gregory brothers had hurled stones at the BMW Xavier usually drove and cracked its windshield. Mistaken identity would have been a plausible, and, quite possibly a successful, defense if Xavier had admitted to the shooting at trial or his admissions had been introduced in lieu of such testimony. Accordingly, Jefferson's failure to call Xavier as a witness or to introduce his admissions, so as to provide Sheldon's mistaken identification defense with its most powerful possible support, constitutes a strong basis for finding his representation of Sheldon ineffective.

The state contends that Jefferson's failure to introduce Xavier's testimony was a permissible strategic decision because Jefferson knew (without talking to him, of course) that Xavier would invoke the Fifth Amendment if called to testify. There is simply no specific support in the record for this contention. The state also urges that Xavier's out-of-court confessions to his mother and to his first attorney would have been excluded as inadmissible hearsay. According to the state, Xavier's out-of-court confessions were not admissible under the hearsay exception for statements against penal interest for two closely related reasons: 1) they were not credible because eyewitnesses had testified that Sheldon was the shooter, and 2) they were not against Xavier's penal interest because if he was tried for the murder in his brother's place, he could always retract his statement by saying that he "was only trying to help [his] little brother." These arguments are speculative and unpersuasive.

■■■■ Under the exception to the hearsay rule for statements against penal interest, Xavier's out-of-court declarations were admissible in evidence if 1) he was unavailable, and 2) his statements "so far ... subjected him to the risk of civil or criminal liability ... that a reasonable man in his position would not have made the statement unless he believed it to be true." Calif.Evid.Code § 1230 (West, 1994). The exception is applied in light of constitutional concerns regarding the exclusion of exculpatory evi-

dence. In *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), the state of Mississippi argued that an extrajudicial confession by "another person" should be excluded as hearsay. The state courts agreed. The Supreme Court reversed, declaring that where a statement substantially implicates the declarant's penal interest, "the hearsay rule may not be applied mechanistically to defeat the ends of justice." *Id.* at 302, 93 S.Ct. at 1049.

■■■■ Under California law a witness who takes the Fifth Amendment is "unavailable." Thus, in Xavier's case, the first requirement would have been met if he refused to testify. The state does not dispute this point. As to the second requirement, the facts and circumstances in the record clearly demonstrate that Xavier's confession was substantially against his penal interest and would almost certainly have subjected him to a significant risk of serious criminal liability. In his confession Xavier admitted to every element necessary to a murder conviction. As noted earlier, moreover, three of the five eyewitnesses—including Raynetta Sanders, who had the only unobstructed view of the shooter and who knew the Sanders brothers best—at some point identified Xavier as the shooter. Notwithstanding the unexplained change in these witnesses' stories, their earlier identification of Xavier made it likely that any confession by him would result in a murder prosecution.

It is not only the risk of prosecution for murder that would tend to make any confession by Xavier credible. Unlike his brother Sheldon, Xavier had a criminal record. Accordingly, if convicted, Xavier likely would have received an even longer prison sentence than the seventeen years to life meted out to his brother. This fact adds significantly to the credibility of his confession.

The confession's credibility is supported by more than the fact that Xavier's admissions subjected him to a substantial risk of criminal liability, with the most serious consequences. There are, for example, the initial eyewitness statements that tended to corroborate his statements. There is also the evidence that provides a motive on Xavier's part; and there is, in addition, the fact that

the confession was repeated a number of times both to his lawyers and to his mother, commencing with the day of the shooting. In sum, the state has simply no basis for contending that Xavier's confession would not have put him in serious jeopardy, that it was without credibility, or that it would for any reason have been inadmissible under California's hearsay exception for statements against penal interest.[14]

Finally, the state also contends that Jefferson decided not to investigate and use Xavier's confession because Sheldon was effectively "tied" to the alibi and inside shot defenses that he presented in his first trial. Admittedly, Xavier's confession was inconsistent with those two defenses, and the state properly notes that had Jefferson successfully introduced either Xavier's testimony or his out-of-court declarations, they would have been "destroyed." What the state fails to acknowledge, however, is that Sheldon's alibi and inside shot defenses were so weak that the state was able to "destroy" them at the second trial without any assistance from Xavier. The only plausible defense in the second trial was mistaken identification, and Xavier's testimony would have been most probative of that defense. We cannot assume that the jury would have disbelieved Xavier's confession simply because he was Sheldon's brother or because other relatives had falsely tried to offer Sheldon an alibi in the first trial. It is one thing for Sheldon's relatives to provide Sheldon with an alibi and take the risk of a possible perjury indictment, knowing that the prosecution would be unlikely to bring such charges. It is quite another for Xavier, a convicted felon, to lie

about committing a murder and thereby expose himself to the prospect of a lifetime prison term or worse.

In short, the only reasonable strategy available to Jefferson at the second trial was to pursue what clearly appeared to be the only plausible scenario, as well the only viable defense—to drop the alibi and inside shot theories and to concentrate his full force on mistaken identity. In order to present an effective defense, Jefferson had to try to obtain Xavier's direct testimony, to attempt to introduce Xavier's confession, and to admit if necessary that the reliance of Sheldon's first attorney on the false alibi testimony in the first trial was an error.[15] But all of this was contingent on Jefferson's being willing to investigate the facts and to listen to and memorialize Xavier's confession. Without that investigation, Jefferson could not even properly determine what defense to try to put on. Jefferson's failure to investigate is inexplicable, as is his failure to utilize Xavier's confession, except as the result of incompetence and indifference. *See* n. 1, *supra.*

Even if the state's assertion that Jefferson was "tied" to the alibi and inside shot defenses presented by Sheldon's attorney in the first trial were correct, Jefferson's failure to investigate, and specifically to interview Xavier, surpasses comprehension. It appears from the record that at the point that Jefferson refused to interview Xavier, Jefferson was not even aware whether *either* Sheldon or Xavier had been present at the scene of the shooting. As far as Jefferson knew, Xavier could have offered evidence directly supporting the alibi defense. Accordingly, Jef-

---

14. The state suggests that we may be bound by a state court finding that Xavier's confession is not admissible as a declaration against interest. This argument is mistaken. First, the state court finding made by the referee and adopted by the court was equivocal. It said only that the argument that the statement would be admissible "is not necessarily meritorious." That would hardly seem to be the type of ruling that would preclude a federal court from reviewing the question. Second, the state court was considering only one of the out-of-court declarations. It is not clear that its ruling would apply to all. More important, the state court's ruling would not appear to bar the use of the declaration that Jefferson likely would have obtained had he been willing to interview Xavier and record his detailed confes-

sion. Third, any state court ruling that such a confession was inadmissible would probably violate *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). Confessions are admissible, regardless of state law, if their exclusion would violate the Due Process Clause of the United States Constitution.

15. Had he "gone straight" in the second trial, Jefferson might have assisted his cause by delving into the possible conflict of interest faced by Sheldon's attorney in the first trial. Of course, Jefferson chose not to follow this route, to the detriment of his client, perhaps because in doing so he might have exposed his own conflict.

ferson should have interviewed Xavier when Xavier came to his office, if for no other reason than to ascertain whether Xavier could be a useful alibi witness. Jefferson's failure to investigate whether crucial evidence existed in support of the defense, *whatever it was,* demonstrates conclusively that Jefferson was not thinking "strategically," but was simply not thinking at all—or was just plain not interested.

The swarm of detail involved in this case may serve momentarily to obscure the simple fact of Jefferson's willful non-feasance. It is beyond dispute, however, that Jefferson's behavior was unconscionable—above all, because he violated his elementary obligation to inquire into both the facts and the law before determining what was in his client's best interest. To refuse to listen to another person's confession to a crime one's client is accused of committing is unfathomable. Moreover, it is rarely a good strategic decision to advance a transparent lie as your client's primary defense, and certainly not when there is a far more plausible defense available. What makes Jefferson's behavior so inexplicable is that he was presented with an opportunity to obtain exculpatory evidence of critical import to his client, evidence that strongly suggested the most viable defense his client possessed—mistaken identity—and he refused to lift a finger to secure it, or even to ascertain its validity.

### B. Prior Misconduct

There are two related and compelling explanations for Jefferson's failure to investigate the case, to interview Xavier, and to use Xavier's admissions in Sheldon's defense: 1) Jefferson's general incompetence and indifference to the interests of his clients, evidenced by his subsequent disbarment for a similar "course of conduct" (*See In the Matter of: Philip Jefferson,* case 83–0–11184, Calif. Bar Court, March 5, 1989 (appended to *People v. Sanders,* 221 Cal.App.3d 350, 424, 271 Cal.Rptr. 534 (2d Dist.1990))); and 2) Jefferson's conflict of interest in this case, evidenced by his statement to attorney Leslie Abramson that "I felt that I was representing the family." The former explanation

comes into sharp focus when we review Jefferson's earlier conduct.

On April 20, 1990, Jefferson was "disbarred from the practice of law ... [for] a course of conduct demonstrating a complete indifference to his legal and ethical duties, to the great detriment of his clients." *Id.* The California State Bar Court findings of a "course of conduct" were based, in turn, on specific instances of "complete indifference" and "great detriment" to clients stretching from 1979 through at least 1987. In most of these instances, Jefferson was retained by clients and then did nothing to investigate or further their cases.

The evidence of Jefferson's pattern of misconduct directly refutes the state's argument that Jefferson's failure to use Xavier's confessions was based on a strategic decision about how best to represent his client, Sheldon. Jefferson's disciplinary record documents a course of conduct wholly inconsistent with the state's supposition about Jefferson's knowledge, intent and motives. Instead, this course of conduct reveals a lawyer who was completely indifferent to his clients, a lawyer who in a number of cases did almost nothing to protect his clients' interests. Jefferson's incompetence and indifference is a far more likely explanation for his failure to investigate the facts and to use Xavier's confession than the state's wholly unsupported conjectures about "strategic" decisions.

There is other evidence of Jefferson's indifference to Sheldon's interests, as well. Jefferson failed to secure a transcript of the first trial. Thus he could not take advantage of inconsistencies between the testimony of the five eyewitnesses at the first trial and at the second. This despite the critical nature of the eyewitness testimony and the fact that three of the five had at some point identified Xavier, and not Sheldon, as the shooter. Jefferson also failed to hire a private investigator to interview witnesses and gather evidence from the scene; failed to hire a ballistics expert to validate the inside shot defense; and failed to familiarize himself with crime scene photos and other physical evidence. In short, aside from showing up in court, Jefferson did little or nothing in his client's behalf.

## C. Prejudice

■ Jefferson's incompetent performance at Sheldon's trial is not enough, standing alone, to establish a Sixth Amendment violation. In addition, Sheldon must show that he was prejudiced by Jefferson's incompetent performance. *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. He must show that "there is a reasonable probability that, absent [Jefferson's] errors, the factfinder would have had a reasonable doubt respecting [his] guilt." *Id.* A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome" of Sheldon's trial. *Id.* at 695, 104 S.Ct. at 2068. It is clear, however, that Sheldon *need not* show that Jefferson's deficient conduct more likely than not altered the outcome in the case. This "preponderance" standard was explicitly rejected in *Strickland.* *Id.* at 693, 104 S.Ct. at 2067.

The answer to the prejudice inquiry in this case is evident. Jefferson's clearly incompetent representation must certainly undermine one's confidence in the murder conviction. Jefferson's incompetence served to deprive Sheldon of the most critical evidence supporting his best defense. Given the fact that three of the state's five eyewitnesses at some point identified Xavier as the shooter, it cannot possibly be said with "fair assurance" that had the jury heard Xavier's confession it would still have convicted Sheldon.

(Former) lawyer Philip Jefferson's gross misconduct carried severe consequences for his client, who, though possibly innocent, was convicted of murder. Jefferson has since been disbarred for a "course of conduct" that evidences chronic inattention to his clients' interests. The California State Bar Court documented *eight* instances in which Jefferson failed to represent his clients even *minimally.* He did the same here—only this time in a murder case. Given Jefferson's wholly incompetent performance, and given the fact that the jury could have been presented with the confession of a person who claimed to be and may have been the "real" shooter, there can simply be no fair assurance that the verdict would have been the same had Sheldon received effective representation.

Thus, we conclude that the writ must be granted on the ground of ineffective assistance of counsel as well as on the ground of conflict of interest.

## III

### REMEDY

■ A federal court is vested " 'with the largest power to control and direct the form of judgment to be entered in cases brought up before it on habeas corpus.' " *Hilton v. Braunskill,* 481 U.S. 770, 775, 107 S.Ct. 2113, 2118, 95 L.Ed.2d 724 (1987) (quoting *In re Bonner,* 151 U.S. 242, 261, 14 S.Ct. 323, 327, 38 L.Ed. 149 (1894)). The court is "free . . . to fashion the remedy as law and justice require . . . [and is not required] to order . . . [petitioner's] immediate release from physical custody." *Davis v. Reynolds,* 890 F.2d 1105, 1112 (10th Cir.1989) (footnote omitted); *see also* Fed.R.App.P. 23(c): "Generally, a district court ruling in the petitioner's favor in a habeas case provides a reasonable time in order to afford the State an opportunity to re-try the defendant or otherwise correct the constitutional infirmity." *Bowen v. Maynard,* 799 F.2d 593, 614 n. 12 (10th Cir.), *cert. denied,* 479 U.S. 962, 107 S.Ct. 458, 93 L.Ed.2d 404 (1986).

Fed.R.App.P. 23(c) provides:

Pending review of a decision ordering the release of a prisoner in such a [habeas corpus] proceeding, the prisoner shall be enlarged upon the prisoner's recognizance, with or without surety, unless the court or justice or judge rendering the decision, or the court of appeals or the Supreme Court, or a judge or justice of either court shall otherwise order.

In this case, given the substantial evidence of Sheldon's actual innocence and the fact that Sheldon already has undergone two trials in state courts and lengthy post-conviction proceedings, we reverse the district court's dismissal of Sheldon Sanders' federal habeas petition and remand to that court with instructions to grant an appropriate writ to release Sheldon Sanders from custody, subject to any reasonable requirements designed to ensure his appearance at possible future proceedings in connection with the

within case as the district court sees fit to impose.

REVERSED AND REMANDED.