76 F.3d 384
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
The ADVISORY COMMITTEE FOR STOCK OWNERSHIP AND TRUST FOR
EMPLOYEES OF MONTANA BANCSYSTEM, INC., and its
subsidiaries, Plaintiff-Appellant/Cross-Appellee,
v.
Eldon E. KUHNS, Defendant-Appellee/Cross-Appellant.
Eldon E. KUHNS, Third-party Plaintiff-Appellee/Cross-Appellant,
v.
MONTANA BANCSYSTEM, INC., Third-party Defendant/Appellee.
 Nos. 94-35658, 94-35687.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Oct. 17, 1995.
Decided Jan. 25, 1996.
 
 1
 Before: REINHARDT and TROTT, Circuit Judges, and SCHWARZER, District Judge.*
 
 
 2
 MEMORANDUM**
 
 
 3
 The Advisory Committee for Stock Ownership Plan and Trust for the employees of Montana Bancsystem, Inc. ("Advisory Committee") filed a declaratory judgment action to determine Eldon E. Kuhns' benefits under Montana Bancsystem Inc.'s ("MBI") Employee Stock Option Plan ("ESOP" or "Plan"). Kuhns filed counterclaims. After a three day bench trial, the district court entered judgment for Kuhns. Both sides now appeal on a multitude of issues. We reverse the district court's decisions on (1) the distribution and segregation of Kuhns' account, (2) the amount due to Kuhns under the Department of Labor settlement agreement, and (3) the award of attorneys fees. We affirm the statutory penalties and the denial of expert witness fees. Finally, we remand this action for further proceedings consistent with our decision.
 
 I. FACTS AND PROCEDURAL BACKGROUND
 A. Background
 
 4
 Eldon Kuhns founded MBI in 1981. Over the years, he held various positions in the company including chief operating officer, chairman of the board, and chairman of the ESOP Advisory Committee.
 
 
 5
 Like other officers and employees of MBI, Kuhns was a member of the ESOP. The ESOP's operation and administration was handled by the Advisory Committee. Every year, MBI made contributions to the ESOP based on each employee's compensation. The ESOP held these contributions in essentially the same manner as a typical profit-sharing, retirement or pension plan.
 
 
 6
 In 1985, the relationship between Kuhns and MBI deteriorated due to a number of factors. Throughout this time period, MBI was experiencing financial difficulties. The company stock's value was fluctuating wildly, and continued to do so until 1992. [E.R. 218 (findings 84-85) ]. Kuhns was also experiencing severe financial problems of his own which were unrelated to the bank. His predicament culminated in a Chapter 11 bankruptcy filing in the fall of 1986. [E.R. 205 (finding 17) ].
 
 
 7
 In December of 1985, Kuhns announced his resignation as chief executive officer. At the time, Kuhns was 100% vested in his ESOP account balance. In January 1986, Kuhns requested a cash distribution of his ESOP account. The requested distribution was not made. In April, Kuhns sent the Advisory Committee a letter repeating his distribution request, but offering to accept installments instead of a lump-sum payment. [E.R. 209-210].
 
 
 8
 In May 1986, the Advisory Committee responded to Kuhns' April request for distribution. The Committee stated that granting Kuhns' request for installment payments was within their discretion, but that they would not grant "a note of exactly the type you asked for." [E.R. 210]. On May 29, 1986, the Advisory Committee sent Kuhns a letter informing him that his termination date for ESOP purposes was deemed to be December 31, 1985, and enclosed forms for Kuhns to fill out to obtain a distribution. [E.R. 211]. However, the Committee's letter did not reveal Kuhns' account balance. [E.R. 211].
 
 
 9
 In order to determine the value of Kuhns' account when he requested distribution, it was necessary to know the value of the ESOP's assets. As of December 31, 1984, the appraised value of the MBI stock was $20.58 per share. [E.R. 208 (finding 29) ]. However, the following year's appraisal proved more troublesome to conduct.
 
 
 10
 Three different appraisals were made of the December 31, 1985 value of MBI's stock. Each appraisal resulted in a different value: $20.39, $10.22, and $16.00. [E.R. 208 (findings 29-31) ]. It was not until the Advisory Committee's meeting of August 22, 1986 that it accepted a $16.00 per share value. [E.R. 69-70]. At this same meeting, the Advisory Committee approved the distribution of the Kuhns account, "... subject to his election of a form of distribution consistent with the provisions of the plan." [E.R. 70]. However, on the same day that the Advisory Committee approved the distribution, Kuhns withdrew his request. [E.R. 80, 58].
 
 B. Kuhns I litigation
 
 11
 In 1986, a dispute arose between MBI and Kuhns concerning, inter alia, the termination of Kuhns' employment with MBI. [E.R. 22 (finding 5) ]. MBI argued that Kuhns' employment terminated on December 31, 1985, but Kuhns advanced a later date.
 
 
 12
 In October 1986, Kuhns and others filed a suit (Kuhns I ) against MBI and its directors, [E.R. 155-66], all of whom were also members of the Advisory Committee. [E.R. 22]. We determined that Kuhns' employment ended on June 30, 1986. Kuhns v. Montana Bancsystem, Inc., Nos. 88-4208 & 88-4209 (9th Cir. Aug. 30, 1990).
 
 C. Department of Labor Settlement
 
 13
 In 1988, the Department of Labor, MBI, the ESOP, and the Advisory Committee entered into a consent agreement. This agreement resolved disputes concerning certain prohibited transactions by the Advisory Committee, and the valuation method used to appraise the value of the ESOP's MBI stock. [E.R. 126-30, 170-75]. As a result of the agreement, the Advisory Committee began using a different method to appraise the ESOP's assets, and MBI contributed 54,000 shares of its stock to the ESOP.
 
 D. This Litigation
 
 14
 In the fall of 1990, Kuhns again requested the distribution of his ESOP account. This request led to a series of proceedings before the Advisory Committee. [E.R. 132-34]. Essentially, Kuhns asked that his account be valued as if it had been distributed to him on June 30, 1986 with accrued interest from that date at the prime rate. [E.R. 139]. The Committee took the position that segregation or distribution was not required in 1986, and that his account balance should be determined by the current value of the MBI stock and other assets currently held by the ESOP. [E.R. 132].
 
 
 15
 The Advisory Committee and Kuhns could not resolve their differences, so the Committee filed this suit as a declaratory judgment action to determine: the amount of Kuhns' ESOP account balance, the method of payment of such account balance, and whether the Advisory Committee had breached its fiduciary duties. [S.E.R. 1].
 
 
 16
 Kuhns filed counterclaims alleging the Committee breached its fiduciary duties and asking for damages under ERISA and various state law claims. Kuhns also filed a third-party complaint against MBI for breach of fiduciary duty.
 
 
 17
 The district court granted summary judgment against Kuhns on his state law claims. [E.R. 20-21]. MBI remained a party to the action apparently only to provide funding to the ESOP if the court determined such funding necessary to correct Kuhns' account balance. [E.R. 57 (amendment 2); E.R. 231 (finding 130) ].
 
 E. MBI/Bank of Montana Merger
 
 18
 On April 1, 1993, approximately eight months before the trial, MBI merged into the Bank of Montana System, and all of the members of the Advisory Committee retired. [E.R. 204]. From that day forward, all of the activities of the Advisory Committee became the responsibility of the Bank of Montana System. [E.R. 204].
 
 II. DISCUSSION
 
 19
 A. Is the Advisory Committee the Real Party in Interest?
 
 
 20
 Kuhns argues that the Advisory Committee is not the real party in interest. This presents a question of law which we review de novo. Campbell v. Wood, 18 F.3d 662, 681 (9th Cir.) (en banc), cert. denied, 114 S.Ct. 2125 (1994).
 
 
 21
 The facts that gave rise to the claim that the Advisory Committee was not the real party in interest existed before the trial began. The merger of MBI and the Bank of Montana occurred eight months before the trial. [S.E.R. 68-69]. MBI's agreement to fund any judgment against the Advisory Committee was made over one month before the trial. [E.R. 19]. Kuhns' failure to raise this issue below prevented the lower court from determining whether the Advisory Committee is the real party in interest. United States ex. rel. Reed v. Callahan, 884 F.2d 1180, 1183 n. 4 (9th Cir.1989), cert. denied, 493 U.S. 1094 (1992). Therefore, we hold that Kuhns waived the issue.
 
 
 22
 B. Does Kuhns lack standing?
 
 
 23
 The Advisory Committee claims Kuhns lacks standing. We review this claim de novo. Barrus v. Sylvania, 55 F.3d 468, 469 (9th Cir.1995).
 
 
 24
 The Committee's argument presupposes that the award to Kuhns was for a breach of fiduciary duty. Specifically: the Advisory Committee breached its fiduciary duty to Kuhns by mishandling his benefit claims. Such an action may not be brought under ERISA. Massachusetts Mutual Life Ins. Co. v. Russell, 473 U.S. 134, 142 (1985) (mishandling of an individual benefit claim does not violate any of the fiduciary duties defined in ERISA).
 
 
 25
 However, the Advisory Committee misconstrues the basis for the district court's judgment. The action was not for breach of fiduciary duty but to recover Kuhns' benefits under the terms of the ESOP plan. [E.R. 235 (finding 19); see also, E.R. 224 (finding 109) (Kuhns disavows all claims for damages based on breach of fiduciary duty) ]. Such an action is expressly allowed by 29 U.S.C. § 1132(a)(1)(b).
 
 
 26
 C. Are Kuhns' claims barred by the statute of limitations?
 
 
 27
 The Advisory Committee argues that the statute of limitations contained in 29 U.S.C. § 1113 bars Kuhns' claims. We review this argument de novo. Mendez v. Ishikawajima-Harima Heavy Indus. Co., 52 F.3d 799, 800 (9th Cir.1995).
 
 
 28
 29 U.S.C. § 1113 expressly applies only to claims alleging a breach of fiduciary duty. 29 U.S.C. § 1113(a) (1988). In cases where claims are made for benefits, federal courts look to the most closely analogous state statute of limitations. Nakaido v. Centennial Life Ins., 42 F.3d 557, 559 (9th Cir.1994). In the absence of a more specific statute, the state statute limiting contract actions will apply. Id.; Flanagan v. Inland Empire Elec. Workers Pension Plan, 3 F.3d 1246, 1252 (9th Cir.1993).
 
 
 29
 Montana has an eight-year statute of limitations for actions involving written contracts. Mont.Code.Ann. § 27-2-202 (1993). The complaint in this matter was filed in 1992. [E.R. 253]. All of the relevant actions in the case occurred after 1984. Therefore, Kuhns' request for distribution or segregation is not barred by the statute of limitations.
 
 
 30
 D. Did the district court err in finding the Advisory Committee abused its discretion by not distributing Kuhns' account to him in 1986 before he withdrew his request?
 
 1. Standard of Review
 
 31
 The ESOP gave the Advisory Committee discretion to construe the Plan's terms. [E.R. 205 (finding 18) ]. Therefore, the Committee's decision to distribute or segregate Kuhns' account could only be reviewed by the district court for an abuse of discretion. [E.R. 233-34 (findings 11-12) ]; Firestone Tire & Rubber Co. v. Bruch, 109 S.Ct. 948, 956 (1989); Winters v. Costco Wholesale Corp., 49 F.3d 550, 553 (9th Cir.1995). However, because all of the members of the Advisory Committee were also members of MBI's Board of Directors, a conflict of interest existed, and this conflict mandated a stringent version of the abuse of discretion standard. Winters at 553. This Court reviews de novo the district court's application of this deferential standard. Taft v. Equitable Life Assur. Society, 9 F.3d 1469, 1471 (9th Cir.1993).
 
 
 32
 2. Did §§ 6.4 and 6.5 require distribution?
 
 
 33
 The Advisory Committee contends that the district court misapplied the abuse of discretion standard when it ruled that the Committee should have distributed Kuhns' account in 1986 before Kuhns withdrew his request. We agree and reverse on this issue.
 
 
 34
 The district court determined that the distribution of Kuhns' account within 60 days of his termination of employment was mandated both by the Committee's routine practice and "standard interpretation" of ESOP sections 6.4 and 6.5. [E.R. 212 (finding 50) ]. These sections state:
 
 6.4 Vesting and Distribution
 
 35
 (a) Distribution: Upon termination of a Participant's employment prior to being 100% vested, attaining Normal Retirement Age or for any reason other than death or disability, the Advisory Committee, in its sole discretion ... may direct the Trustee to pay the Participant the vested portion of all his Account Balance ... within sixty (60) days after the close of the Plan Year....
 
 
 36
 ....
 
 
 37
 6.5(a) Time of Payment. A Participant's plan benefit will be computed as soon as possible after the date on which his participation ends.
 
 
 38
 ....
 
 
 39
 The Advisory Committee shall have the right to direct that distribution to Participants who terminate service for any reason other than retirement, death or total or permanent disability shall be deferred and distributed no later than their normal retirement date.
 
 
 40
 ....
 
 
 41
 (emphasis added).
 
 
 42
 Unfortunately, the district court did not explain how "standard interpretation" of these provisions leads to the conclusion that the Committee's failure to make a distribution was an abuse of discretion. Sections 6.4 and 6.5 show that the Advisory Committee had the option of making distributions before normal retirement age, but such distributions were not required.
 
 
 43
 More importantly such a distribution would have been unwise in 1986 before the value of MBI's stock was determined. Most of the ESOP's assets consisted of MBI stock. In order to determine the value of Kuhns' account, it was necessary to have the stock's value accurately appraised. For the fiscal year ending December 31, 1985, the Advisory Committee found it necessary to obtain three separate appraisals, and these appraisals took time.[1] The Advisory Committee did not meet until August 22, 1986 to approve distributions--including Kuhns' request. [E.R. 70]. On that day however, Kuhns withdrew his request for a distribution thereby mooting any duty to distribute.
 
 
 44
 3. Was distribution required under the early retirement provisions of the ESOP?
 
 
 45
 The district court concluded that sections 1.14 and 6.1, which provide for early retirement, required that the Committee segregate Kuhns' account as of December 31, 1985, and then distribute to Kuhns when he reached age 55. [E.R. 220 (finding 92) ]. We disagree.
 
 
 46
 Section 1.14 defines Early Retirement Date as "the first day of the month after the Participant attains his 55th birthday and completes ten Years of Service...." Section 6.1 provides:
 
 
 47
 Distribution Upon Retirement. Every Participant shall retire for the purposes hereof on his Normal Retirement Date or Early Retirement Date.... The Advisory Committee, in accordance with Section 6.5, shall direct the Trustee to distribute to such participant such vested amount.
 
 
 48
 Section 6.5, however, requires distribution only by the Normal Retirement Date, not the Early Retirement Date. Supra. This date is defined as the first day of the month after the participant attains his 65th birthday. [ESOP § 1.22].
 
 
 49
 The early retirement provisions of the ESOP, therefore, did not require that Kuhns' account be distributed in 1986 because he was not yet 65. The district court was incorrect in finding that the Advisory Committee abused its discretion by not making such a distribution.
 
 
 50
 E. Did the Advisory Committee abuse its discretion by not segregating, liquidating, and reinvesting Kuhns' account in 1986?
 
 
 51
 The district court found that if Kuhns' account was not distributed to him in 1986, it should have been separated from the rest of the general ESOP fund, liquidated, and reinvested so that it was no longer subject to swings in value of MBI stock. [E.R. 217-20 (findings 77-94) ]. By not doing so, the district court said, the Advisory Committee abused its discretion. In reaching this conclusion, the district court relied on the provisions of the plan, the ESOP Summary Plan Description, Mr. Kuhns' request for a distribution, expert witness testimony, and the Committee's knowledge of the fluctuating value of MBI's stock. [E.R. 217-220 (findings 77-94) ].
 
 
 52
 The trial court's analysis began with section 1.2 of the ESOP. This section states:
 
 
 53
 A Participant's Account Balance in his Account upon termination of his employment with the employer shall initially be the dollar value of the Participant's Account as of the Valuation Date immediately preceding the termination of the Participant's employment with the Employer. A Participant's initial Account Balance in each such account shall be reduced by all distributions therefrom, if any, and shall be subsequently adjusted, for earnings and forfeitures, if at all, on subsequent Valuation Dates as provided in ARTICLE 5, ALLOCATIONS TO PARTICIPANTS' ACCOUNTS.
 
 
 54
 The court concluded that this section allowed a balance, once determined, to be adjusted only for earnings and forfeitures, and not for unrealized losses incurred by the ESOP. [E.R. 217 (finding 78) ]. The court found that this interpretation was in accordance with the ESOP Summary Plan Description circulated by MBI to the Plan participants. [E.R. 217 (finding 79) ].
 
 
 55
 The court's analysis continued with an examination of ESOP section 6.6 (allowing for segregation of accounts) and section 9.2 (permitting the trustee to liquidate and reinvest segregated accounts). [E.R. 218 (findings 81 & 82) ]. The court concluded that because the Advisory Committee could segregate, liquidate, and reinvest the account, it should have done so in light of the fluctuating value of the MBI stock. E.R. 218-19 (findings 85-89).
 
 
 56
 The problem with the district court's analysis begins with ESOP Article 5. This part of the ESOP indicates that former participants' accounts may be adjusted for unrealized losses. Section 5.2(a) provides:
 
 
 57
 The Advisory Committee shall determine or cause to be determined as of the end of each Accounting Date, the income and realized and unrealized gain or loss of the Accounts for the Plan Year, and after deducting any expenses chargeable thereto, if any, shall credit or charge the resulting amount among those Accounts of all participants and Former Participants whose Accounts have not been segregated pursuant to Section 6.6.... The allocation of such realized and unrealized gain or loss shall be made in the ratio which the dollar value of each such Account, reduced by the Amount of any distributions therefrom since the preceding Valuation Date, bears to the aggregate dollar values of all such Accounts as of the preceding Valuation Date....
 
 
 58
 (emphasis added).
 
 
 59
 Moreover, the decision to segregate is left to the Advisory Committee's discretion. Section 6.6 states:
 
 
 60
 If the trustee shall hold funds or values representing the Accrued Benefit of a Participant or his Beneficiary under the provisions of this Article 6, Distributions, the trustee, upon direction of the Advisory Committee may segregate [emphasis added] the Employer Securities and deposit any funds in lieu of fractional shares in an appropriate account at a bank or a money market account. The Participant or his Beneficiary shall be entitled to any dividends or interest paid thereon. Any such segregated account shall not be considered an account for purposes of Article 5, Allocations to Participants' Accounts. If the Trustee shall not place such funds in a segregated account, such funds shall be deemed an account for the purposes of sharing in net gains and losses of the Trust under Section 5.5.
 
 
 61
 [E.R. 152-53].
 
 
 62
 Because the value of MBI's stock was not known, it would have been impossible for the Advisory Committee to have segregated, liquefied and reinvested Kuhns' account within the time frame called for by the district court. Furthermore, Kuhns never requested that the account be segregated. Therefore we hold that the Advisory Committee's decision not to segregate within the time frame called for by the district court was not an abuse of discretion, and we reverse and remand for further proceedings.
 
 
 63
 F. Did the District Court allocate the correct amount of the Department of Labor Settlement to Kuhns' Account?
 
 1. Standard of Review
 
 64
 The Department of Labor ("DOL") settlement presents mixed issues of law and fact and is reviewed de novo. Campbell v. Wood, 18 F.3d 662, 681 (9th Cir.) (en banc ), cert. denied, 114 S.Ct. 2125 (1994).
 
 2. Facts
 
 65
 The ESOP was audited by the DOL in 1987. As a result of this investigation, the DOL filed suit against MBI, the ESOP, and the Advisory Committee in July of 1988. The complaint alleged that the defendants breached their fiduciary duties by causing or permitting the plan to obtain MBI shares from MBI and other parties in interest at control premium prices, even though the ESOP never held more than 15% of MBI's stock. According to the complaint, the plan purchased MBI shares for more than adequate consideration and engaged in prohibited transactions. [E.R. 170-75, 220-21].
 
 
 66
 A consent order disposing of all of the DOL's claims was entered three days after the complaint was filed. [E.R. 126-30]. In this order, the members of the Advisory Committee and MBI neither admitted nor denied any of the allegations of the complaint. However, they did promise to: (1) comply with the ERISA sections pertaining to fiduciary duty and prohibited transactions, (2) utilize a trustee to make all decisions regarding the acquisition of shares by the ESOP, (3) utilize a minority discount method of valuing the MBI stock held by the ESOP, and (4) have MBI contribute 54,000 shares of stock to the ESOP. [E.R. 126-130].
 
 
 67
 The district court determined Kuhns was entitled to 14.14% of the 54,000 shares MBI contributed to the ESOP in 1988 pursuant to the DOL settlement. [E.R. 220-23 (findings 95-106) ]. The court set the stock value at $16.00 per share (the December 31, 1985 value) rather than $7.10 per share (the December 31, 1988 value).
 
 3. Analysis
 
 68
 The only purpose the district court found for the settlement was to make restitution to the Plan for breaches of fiduciary duty which occurred prior to Kuhns' termination. [E.R. 221-22 (findings 99 & 100) ]. This interpretation of the settlement is wrong. The settlement agreement states that the contribution was for two purposes: to compensate for past prohibited transactions, and to neutralize the effect of changing from a control premium to a minority discount method of valuing MBI stock.[2]
 
 
 69
 The district court's interpretation overlooks the fact that the contribution was partially intended to compensate for the ESOP's loss in appraised value. This loss resulted from the change in valuation methods. The appraised value of stock is higher under a control premium valuation than it is under a minority discount valuation.
 
 
 70
 Kuhns was not injured by the change in appraisal method. The court determined the value of his account using a $16.00 per share appraised value. This value was estimated in 1986 when the ESOP still utilized the control premium valuation method.
 
 
 71
 Because the district court did not distinguish between those parts of the contribution designed to remedy past transactions, and those parts designed to compensate for the change in valuation methods, we reverse and remand for further proceedings on this issue.
 
 
 72
 G. Did the district court properly assess statutory penalties against the Advisory Committee for its failure to provide Kuhns information on his account?
 
 1. Standard of Review
 
 73
 We review the district court's award of statutory penalties for an abuse of discretion. Curry v. Contract Fabricators Inc. Profit Sharing Plan, 891 F.2d 842, 847 (11th Cir.1990).
 
 2. Statutory Penalties
 
 74
 Under ERISA, Kuhns has a right to request certain ESOP information from the Advisory Committee. Failing to provide this information subjects the Advisory Committee to a penalty of up to $100 per day at the discretion of the district court. 29 U.S.C. § 1132(c). The district court penalized the Advisory Committee $33.00 a day--for a total of $19,338--for failing to respond to Kuhns' request for 586 days.
 
 
 75
 The Committee argues that the penalty was too severe because it did not act in bad faith and that Kuhns never proved injury. However, prejudice, injury, or bad faith, are not prerequisites for penalties under § 1132(c). Moothart v. Bell, 21 F.3d 1449, 1506 (10th Cir.1994) (prejudice and injury not prerequisites); Curry v. Contract Fabricators, Inc. Profit Sharing Plan, 891 F.2d 842, 847 (11th Cir.1990) (same); Daniel v. Eaton Corp., 839 F.2d 263, 267 (6th Cir.) (affirming award despite the fact that failure to respond was only the result of neglect), cert. denied, 488 U.S. 826 (1988); Kincaid v. Harcour Brace Jovanovich, Inc., 863 F.Supp. 1471 (D.Kan.1994) (bad faith not required). Rather, these are factors the district court may consider in deciding whether to exercise its discretion.
 
 
 76
 The district court's award of $33.00 a day was well within the trial court's discretion. Although bad faith was not found, the trial court ruled that the Advisory Committee was at least negligent in not providing the requested information. [E.R. 226-27 (finding 119) ]. Moreover, although actual prejudice need not be proved, the fact that it took over 580 days to respond to the request indicates that at least some harm was done--Kuhns was not given information he was entitled to receive.
 
 
 77
 Kuhns argues that there were two additional failures of the Advisory Committee to give him requested information. [Kuhns' Brief 29]. However, none of the evidence he cites is sufficient to alter the district court's findings.
 
 
 78
 H. Kuhns attorneys fees.
 
 
 79
 Under 29 U.S.C. § 1132(g)(1) a court may award reasonable attorneys fees and costs of action to either party. Five considerations, known as Hummell factors, guide the courts discretion. These factors are;
 
 
 80
 (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of fees; (3) whether an award of fees against the opposing parties would deter others acting under similar circumstances; (4) whether the parties requesting fees sought to benefit all participants of an ERISA plan or to resolve a significant legal question regarding ERISA; and (5) the relative merits of the parties positions.
 
 
 81
 Hummell v. S.E. Rykoff & Co., 634 F.2d 446, 453 (9th Cir.1980).
 
 
 82
 The district court applied the Hummell factors in light of its decisions on the substantive issues in this case and awarded Kunhs $86,500 in attorneys fees. Much of Kuhns victory at the district court, however, has been lost in this appeal. We therefore reverse the grant of attorneys fees and remand for the district court to reweigh the Hummell factors in light of our decision.
 
 
 83
 I. Did the district court properly deny Kuhns recovery of his expert witness fees?
 
 
 84
 Kuhns claims that the district court erred in denying him recovery of his expert witness fees. The district correctly found that such expenses are unrecoverable as a matter of law. Crawford Fitting Co. v. J.T. Gibbons, Inc., 482 U.S. 437, 445 (1987) ("[A]bsent explicit statutory or contractual authorization for the taxation of expenses of a litigant's witnesses as costs, federal courts are bound by the limitations set out in 28 U.S.C. § 1821 and § 1920."); Downey Community Hosp. v. Wilson, 977 F.2d 470 (9th Cir.1992) (holding expert witness fees not recoverable in ERISA actions).
 
 III. CONCLUSION
 
 85
 We reverse the district court's decisions on the issues of: the distribution and segregation of Kuhns' account; the amount due to Kuhns under the DOL settlement agreement; and Kuhns' award for attorneys fees. The award of statutory penalties and the denial of expert witness fees are affirmed. Finally, we remand this case for further proceedings consistent with this decision.
 
 
 86
 REVERSED IN PART, AFFIRMED IN PART, REMANDED.
 
 
 87
 THE PARTIES SHALL BEAR THEIR OWN COSTS OF THIS APPEAL.
 
 
 88
 REINHARDT, Circuit Judge, concurring.
 
 
 89
 I concur but write separately only to say that I would not attempt to construe Sections 6.4 and 6.5 of the Plan, as my able colleagues strive so valiantly to do in Section D. 2. It was unnecessary for them to undertake that exercise because we have previously held that Kuhns' employment terminated on June 30, 1986. Thus, on August 22, 1986, when Kuhns withdrew his request for a distribution, it had not yet been 60 days from the date of his retirement, the earliest date on which the Committee was required to pay, no matter how we construe the provisions of the Plan. I believe, although I am not certain, that the same analysis applies to Section D. 3 of the disposition as well.
 
 
 
 *
 Honorable William W. Schwarzer, United States District Judge, Northern District of California, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [1]
 In Kuhns I, the district court found that "[o]btaining the second and third appraisals was in the best interest of MBI, its ESOP and the beneficiaries of the ESOP." [E.R. 162 (finding 59) ]
 
 
 [2]
 The consent order states:
 
 
 [7]
 The implementing of the valuation method required ... under this consent order is likely to cause the value of the Plan's assets to decline. In order to ameliorate the effect of this change in valuation method and to correct the transactions described in the complaint, MBI and the members of the Advisory Committee shall cause 54,000 shares of MBI stock to be transferred to the plan
 [E.R. 129 (emphasis added) ].