131 F.3d 146
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Lee Perry FARMER, Petitioner-Appellant,
v.
John RATELLE, Warden; Daniel E. Lungren, Attorney General
of the State of California, Respondents-Appellees.
 No. 96-56489.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted August 7, 1997
Decided November 21, 1997.
 
 1
 Appeal from the United States District Court for the Central District of California, No. CV-94-00697-GLT; Gary L. Taylor, District Judge, Presiding.
 
 
 2
 Before: HALL and T.G. NELSON, Circuit Judges, and WINMILL,** District Judge.
 
 
 3
 MEMORANDUM*
 
 
 4
 Lee Perry Farmer ("Farmer") appeals the district court's denial of his petition for writ of habeas corpus, arguing that the district court should have concluded that Farmer's trial counsel, Joseph Myers ("Myers"), had rendered ineffective assistance. We have jurisdiction under 28 U.S.C. § 2253. We review a district court's decision to deny a § 2254 petition for habeas corpus de novo. Martinez-Villareal v. Lewis, 80 F.3d 1301, 1305 (9th Cir.), cert. denied, 117 S.Ct. 588 (1996). We reverse.
 
 I.
 
 5
 Farmer's claim that his counsel's assistance was so defective as to require reversal of his conviction requires him to satisfy two components. First, he must show "that counsel's performance was deficient" and that Myers "made errors so serious that [he] was not functioning as the 'counsel' guaranteed" by the Sixth Amendment. Strickland v. Washington, 466 U.S. 668, 687 (1984). Second, Farmer "must show that the deficient performance prejudiced the defense" and deprived Farmer of a fair trial. Id. Although there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and "[j]udicial scrutiny of counsel's performance must be highly deferential," id. at 689, we conclude that Myers' representation of Farmer at trial was so deficient that it casts substantial doubt on the validity of the jury's verdict.
 
 II.
 
 6
 "A lawyer's first duty is zealously to represent his or her client." Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir.1994). Myers' refusal to present the most powerful exculpatory evidence available to a defense attorney representing a client in a capital murder case, a third-party confession, exhibits with striking clarity Myers' violation of this primary duty. Only Myers' ineffectiveness can adequately explain his deficient representation at Farmer's trial
 
 
 7
 A review of the course of events and the evidence available to Myers before jury selection in Farmer's case was completed brings Myers' deficient performance into clearer focus. Even before jury selection had begun in Farmer's trial, Myers was aware that Dorothy Hicks ("Hicks"), Farmer's wife by the time of the trial, was prepared to testify in detail regarding a meeting between her, Charles Huffman ("Huffman"), and his wife, Victoria Huffman, at a local Burger King restaurant. At the meeting, which preceded his arrest for the murder, Huffman allegedly told Hicks, Farmer's girlfriend at the time, that he, not Farmer, had shot the victim three times, and he expressed surprise that the victim had survived for even a short period of time after being shot. About a week later, Huffman again told Hicks several times that he had killed the victim, confessing to sole responsibility for the murder or which Farmer was charged.
 
 
 8
 After jury selection in Farmer's trial had begun, Myers visited Huffman twice in custody, once in the county jail and once in the state prison, while Huffman was awaiting sentencing on other charges after having been acquitted of the murder. During Myers' interview on June 27, 1982, Huffman confessed to the killing. On July 15, 1982, after Farmer's jury had been sworn, but before the presentation of evidence had begun, Huffman again confessed to Myers that he was responsible for the murder for which he had been acquitted and Farmer was now facing trial. For no reason that appears in the record, Myers never took a single note regarding the confessions or memorialized them in any way,[1] failed to bring a corroborating witness (such as his own investigator) to either one, and told no one, least of all his client, about Huffman's jailhouse confessions.
 
 
 9
 On July 20, 1982, the first day evidence was presented at Farmer's trial, the State's detective conducted a taped interview of Huffman in prison. The transcript of that interview is certainly damaging to Farmer's claim that he did not commit the shooting. Huffman described the shooting in great detail, even including a motive for Farmer to return to Lloyd Reed's home that night: to kill Reed for a $500 debt. Huffman not only described how he supposedly waited outside while Farmer entered the home alone and fired three shots into the victim ("sounded like a cannon"), but he also included Farmer's oral confession to the killing ("Hey I just blown somebody away in there, you know"). Huffman even remembered to tell the detective that when he asked Farmer about the identity of the victim, Farmer told him that Huffman did not know him and would not recognize the name. It is certainly fair to say that this taped interview directly and completely contradicted Huffman's earlier confessions to Myers and Hicks.
 
 
 10
 On July 28, 1982, during a conference in chambers, Myers indicated his intention to call Hicks to testify to Huffman's confessions. He told the court that if the detective's taped interview were admissible to impeach Hicks' testimony, then he would not call Hicks as a witness. Myers argued, though, that it was "very clear" from the tape that "Mr. Huffman is at this point simply angling to get out of prison. And according to other information we have had, doesn't want to make his wife look like a liar." Myers clearly recognized Huffman's credibility problems in giving the taped interview, noting the obvious differences between what he told police a week after the shooting and what he told the State's detective about Farmer's involvement after Huffman had been acquitted of the murder. After some discussion about the admissibility of the interview under California's evidence rules, the trial court indicated that should Hicks testify as expected, it would allow the State to introduce Huffman's taped statement to the State's detective as impeachment evidence.
 
 
 11
 Even given the court's anticipatory ruling, no reasonable attorney would have been deterred from presenting Hicks' testimony regarding Huffman's multiple concessions. We have previously viewed much evidence as "highly exculpatory" because "third party confessions, if believed, would necessarily exonerate the defendant of the primary offense." Perry v. Rushen, 713 F.2d 1447, 1452 (9th Cir.1983). Even if not completely accepted by the jury, evidence of a third-party confession casts a dark cloud of reasonable doubt over the guilt of the defendant. There is simply no reasonable explanation for failing to introduce this evidence under these circumstances.
 
 
 12
 Myers grossly overestimated the evidentiary value of Huffman's tape-recorded statement implicating Farmer in the shooting. The credibility of Huffman's statements to the State's detective was vulnerable to multiple avenues of attack. Given the July 28 conference in chambers, Myers apparently recognized this fact at some point, but for inexplicable reasons, completely discounted this vulnerability and dismissed the possibility of a direct attack on Huffman's taped interview. Directly attacking this evidence, though, had the potential to add powerful persuasive force to Farmer's defense. Huffman had, after all, just recently been acquitted of the same crime. No one would expect Huffman to suddenly confess to that crime in front of the State's investigators, the same people who had tried so hard to convict him and failed. If Huffman actually committed the shooting, he would no doubt go to great lengths to hide the fact that he had just gotten away with something. Further, at the time of the interview, Huffman was awaiting sentencing on other charges. What better way to curry favor with the State's authorities, who would soon make a recommendation as to the length of Huffman's sentence, than to provide damning evidence that implicated Farmer in the shooting? A competent attorney would not have allowed this piece of self-serving impeachment evidence to prevent the admission of Huffman's confessions. At a minimum, Huffman's confessions would have provided Farmer's defense attorney with a strong evidentiary argument for reasonable doubt.
 
 
 13
 Such an obvious approach to countering the State's impeachment evidence apparently occurred to Myers, but was dismissed as insignificant by his illogical pursuit of a witness who could corroborate Hicks' testimony. Myers later stated in his declaration attached to Farmer's habeas petition that he would have called Hicks and endured the State's impeachment evidence if he had only had "a witness untainted by bias or a previous relationship with Mr. Farmer" to rehabilitate Hicks' testimony. Myers did not want just any rehabilitative witness, though, but believed that only a witness who could corroborate Hicks' testimony by testifying to another occasion where Huffman had confessed to the shooting would justify calling Hicks to the stand. That Myers declined to introduce Huffman's confessions--the strongest exculpatory evidence available to a defense attorney in a capital case--during the guilt phase of Farmer's trial simply because he lacked a rehabilitative witness who would testify to another confession by Huffman is difficult to fathom. Attorneys must. deal with impeachment all the time, most commonly on redirect examination following an incisive cross-examination by the attorney representing the other side. Occasionally, the opposition may present an actual witness or physical evidence that rebuts another witness's testimony. Many times, however, attorneys seeking to rehabilitate the credibility of an impeached witness will not have a rehabilitative witness to fall back on. But that certainly does not stop the competent attorney from presenting evidence bearing such strong probative and exculpatory value as the evidence which Myers possessed. The risk that the State would attempt to impeach Hicks' testimony was far outweighed by the risk that Farmer would be convicted absent this evidence.
 
 
 14
 Besides, Myers had available to him precisely the rehabilitative witness whom he had been seeking: himself. The moment that Myers realized that the trial court would admit the State's tape-recorded statement of Huffman as impeachment evidence to counter Hicks' testimony, Myers should have notified the court of his previous conversations with Huffman and the evidence he possessed concerning Huffman's other confessions.[2] The trial court would have been faced with a decision as to how to proceed, and could have (1) appointed limited substitute counsel to represent Farmer during Myers' testimony as a rehabilitative witness, or (2) allowed Myers to withdraw and appointed permanent substitute counsel. Myers never gave the trial court the chance to make that decision, though, because he told no one about his interviews with Huffman, not even his own client. In the face of the trial court's ruling on the State's impeachment evidence, Myers sat mute. Myers' explanation that he did not testify himself during the guilt phase because he believed the jury would view his testimony as self-serving and one-sided is wholly unsatisfactory and cannot excuse his failure to call Hicks to testify.[3]
 
 
 15
 Both parties to this case spend a sizeable portion of their appellate briefs discussing whether Myers labored under an actual conflict of interest. The question of whether or not Myers was faced with a conflict of interest due to his exclusive possession of relevant evidence following his interviews of Huffman, however, misses the point. What is important in this case is that Myers did possess this evidence and could have been a rehabilitative witness to Hicks' impeached testimony. The real significance of the information Myers possessed is that he could have personally played the foil to the State's impeachment evidence, however unreasonable it was to believe that only the existence of such a rehabilitative witness would justify introducing the confessions at all. Myers' ineffectiveness does not turn on the question of whether he was faced with a conflict of interest that should have compelled him to withdraw from his representation of Farmer. Rather, his ineffectiveness is illuminated by his failure to introduce extremely powerful exculpatory evidence of a third-party confession, and his weak post-trial excuses for that failure.
 
 
 16
 This case bears a striking resemblance to the situation we faced in Sanders v. Ratelle, 21 F.3d 1446 (9th Cir.1994). In Sanders, we held that the defendant's attorney had rendered ineffective assistance of counsel on two independent bases: (1) the attorney had utterly failed to conduct any investigation of the existence of a third-party confession, even though he knew that the third party was willing to confess and had previously done so in the presence of other witnesses, and (2) the attorney was incompetent in failing to present a defense that someone else had committed the murder and failing to introduce the evidence of the third-party confession. Although Myers at least conducted some independent investigation into the existence of Huffman's confessions, he, like the attorney in Sanders, completely failed to present that evidence in support of a defense that someone else had committed the shooting.
 
 
 17
 After Myers abandoned the "Huffman did it" defense following the trial court's ruling on the admissibility of the State's taped statement, he apparently felt that he was "forced" into relying on the only remaining viable defense: mistaken identification by the victim. This was not a particularly fruitless defense; with his dying breath, the victim told the police dispatcher on the telephone that he had been shot, and provided a description of the perpetrator that seemed to match Huffman as much as Farmer. The victim also noted that he knew the shooter, but could not remember his name. Without other witnesses to the shooting or the appearance at trial of the (by then deceased) victim, however, the mistaken identity defense was based solely on what the victim told the dispatcher at the time of the telephone call.
 
 
 18
 In Sanders, the defendant also presented a mistaken identification defense, wherein three of the five eyewitnesses to the shooting had at one time identified someone else as the shooter. Id. at 1457. That other individual was, in fact, the same person who had confessed to the shooting. Given those facts, we held:
 
 
 19
 Mistaken identity would have been a plausible, and, quite possibly a successful, defense if Xavier [the confessor] had admitted to the shooting at trial or his admissions had been introduced in lieu of such testimony. Accordingly, [the defense attorney's] failure to call Xavier as a witness or to introduce his admissions, sc as to provide [the defendant's] mistaken identification defense with its most powerful possible support, constitutes a strong basis for finding his representation of [the defendant] ineffective.
 
 
 20
 Id. at 1458. The same circumstances are present in this case. Like the confessor in Sanders, Huffman had a definite motive for killing the victim: the victim supposedly surprised Huffman during a burglary while Huffman was stealing drugs and guns contained in the apartment. Further, as in Sanders, not only were the defenses of mistaken identification by the victim and Huffman's confessions not inconsistent, but Huffman's confessions would have substantially strengthened the persuasive force of the mistaken identity defense. The two defenses would have gone hand in hand; the victim was describing Huffman, not Farmer, to the police dispatcher, as evidenced by Huffman's subsequent confessions. By itself, the mistaken identity defense was relatively insubstantial because there was so little evidence to go on. But combined with the defense that Huffman committed the crime, bolstered by Huffman's confessions, both defenses would have been more convincing, and there is a fair chance that a jury would have been persuaded that reasonable doubt existed as to Farmer's guilt.
 
 
 21
 Given the evidence available at trial, the "only reasonable strategy" available to Myers, like the attorney in Sanders, "was to pursue what clearly appeared to be the only plausible scenario, as well the only viable defense," id. at 1459; namely, the defense of mistaken identification by the victim, strengthened and corroborated by Huffman's confessions. Myers' complete failure to advocate Farmer's best defense that Huffman committed the shooting, and his failure, without a rational excuse, to introduce the strongest exculpatory evidence available to a defense attorney in a capital case, a third-party confession, amount to ineffective assistance of counsel.
 
 III.
 
 22
 Our holding that Myers was ineffective does not, of course, end the inquiry. Farmer must also demonstrate that he was prejudiced by Myers' incompetent performance. Strickland, 466 U.S. at 694. He must show that "there is a reasonable probability that, absent [Myers'] errors, the factfinder would have had a reasonable doubt respecting [his] guilt." Id. at 695. A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome" of Farmer's trial. Id. at 694.
 
 
 23
 We have little trouble concluding that Farmer has adequately demonstrated prejudice to his defense. Myers' incompetence "served to deprive [Farmer] of the most critical evidence supporting his best defense." Sanders, 21 F.3d at 1461. Just as in Sanders, "given the fact that the jury could have been presented with the confession of a person who claimed to be and may have been the 'real' shooter there can simply be no fair assurance that the verdict would have been the same had [Farmer] received effective representation." Id. Therefore, there is a reasonable probability that the result of Farmer's trial would have been different had he been represented by effective counsel.
 
 CONCLUSION
 
 24
 Because Farmer received ineffectice assistance of counsel at trial, we REVERSE the district court's denial of his petition for writ of habeas corpus and REMAND with instructions to grant the writ and order Farmer's release unless the State, within a reasonable time to be established by the district court, decides to retry Farmer.
 
 
 25
 REVERSED AND REMANDED WITH INSTRUCTIONS.
 
 
 
 **
 Honorable B. Lynn Winmill, United States District Judge for the District of Idaho, sitting by designation
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [1]
 Myers did attempt to tape record his second interview with Huffman but the tape recorder was confiscated by prison officials
 
 
 [2]
 Myers' weak notice to the court during the conference in chambers that Huffman had twice confessed to him does not qualify as the type of notice we envision. Myers barely mentioned the other confessions in the context of a specific request for an advance ruling on the admissibility of the State's taped interview. Myers expressly told the court that its ruling on the admissibility of the taped interview would determine whether or not Myers would call Hicks to testify. Myers should have made clear to the trial court that if the taped interview were ruled admissible, Myers would entertain the possibility that he, himself would have to testify. This Myers failed to do
 
 
 [3]
 Whatever reservations Myers held concerning the one-sidedness of his "self-serving" testimony were apparently dispelled after Farmer was convicted of first-degree murder 12 days later, since Myers testified to the Huffman interviews at the penalty phase of the trial