Kumyet **CHEUNG, Petitioner,**

v.

**Thomas M. MADDOCK, Warden, et al., Respondent.**

**No. C–98–00753 CRB.**

United States District Court, N.D. California.

Nov. 24, 1998.

Ted W. Cassman, Cooper, Arguedas & Cassman, Emeryville, CA, for Petitioner.

Ronald E. Niver, California State Attorney General's Office, San Francisco, CA, for Respondent.

## MEMORANDUM AND ORDER

BREYER, District Judge.

Now before the Court is petitioner Kuymet Cheung's petition for writ of habeas corpus. The petition arises out of Mr. Cheung's 1996 conviction for attempted voluntary manslaughter of Harell Haskins and the assault with a deadly weapon of Oscar Hogroe. After careful review and consideration of the papers submitted, and having had the benefit of oral argument, the petition for writ of habeas corpus is GRANTED.

## I. BACKGROUND

### A. Procedural History.

On May 17, 1995, petitioner was charged by an information with two counts of attempted murder of Harell Haskins and Oscar Hogroe. (Penal Code §§ 667(e)(1), 187.) Petitioner was additionally charged with an enhancement allegation for intentional infliction of great bodily injury, the personal use of a firearm, and personal use of a handgun.

Petitioner was tried before a jury, commencing on July 10, 1995. On July, 27, 1995, the jury returned its verdicts of guilty on the lesser included offenses of attempted voluntary manslaughter and assault with a firearm. The jury also found true the enhancement allegations that petitioner had intentionally inflicted great bodily injury during the commission of the offense on Haskins and that he had personally used a firearm during the commission of both offenses. During a stipulated and bifurcated trial to the court, the trial judge found true a prior conviction allegation pursuant to California Penal Code section 667(a)(1). The court then sentenced petitioner to 29 years and eight months in prison.

Petitioner appealed his conviction, and on July 15, 1997, the California Court of Appeal affirmed the judgment. The California Supreme Court denied review on October 29, 1997. This petition followed.

### B. The Trial Evidence.

#### 1. The Shooting Incident.

On the night of February 1, 1995, petitioner and three companions, all Asian American males, went to the Emeryville Denny's restaurant. Petitioner's companions were Kenny Lei, Kevin Woon and an individual known only as "Ho." When petitioner and his companions decided to leave, they had trouble getting their waitress's attention, so petitioner went directly to the cashier for the bill. As they were paying at the cashier, three people, Harell Haskins, Rochelle Roberts, who was Haskins' girlfriend, and Oscar Hogroe, entered the Denny's. As they passed through the waiting area one of petitioner's companions bumped into Haskins. Haskins confronted the four men to demand an apology. There followed a short confrontation. Roberts intervened to prevent the confrontation from escalating. Petitioner similarly tried to defuse the situation by saying that they did not want any trouble and that he would apologize for the person who had bumped into Haskins. All witnesses for both the prosecution and defense agreed that petitioner was the person who acted as a "peacemaker" during this incident.

Haskins, Roberts and Hogroe returned to the waiting area. Meanwhile, petitioner also returned to the cash register to get his change, accompanied by one or more of the other men. After retrieving his change, petitioner started to leave. Haskins testified that petitioner directed a racial slur at him on his way out, but neither Roberts nor Hogroe heard the comment.

Haskins testified that he followed petitioner outside the restaurant. Once he was outside, he testified that petitioner swung around, grabbed a gun from his waist, and shot him. The shooter then fired two more shots in Hogroe's direction, but both missed. Hogroe testified that petitioner was the shooter and that he, Hogroe, grabbed one of petitioner's friends as a shield. Two of petitioner's companions, Kenny Lei and Kevin Woon, testified that Hogroe grabbed petitioner as a shield. Woon also testified that Ho, not petitioner, was the shooter. None of the other witnesses present at Denny's were able to positively identify the shooter.

#### 2. The Evidence Of Haskins' Alcohol Consumption.

Haskins, Roberts and Hogroe each testified that on February 1, 1995, they went to a San Leandro club called "Bogies" to cele-

brate the birthday of Haskins' god-brother. Bogies is a dance club that serves alcoholic beverages. Haskins, Roberts and Hogroe stayed at the club from about 9:00 or 10:00 p.m. until about 1:30 a.m. Haskins testified that over the course of the evening he shared one or maybe two strawberry daiquiris with his girlfriend, Roberts. Roberts testified that Haskins shared one drink with her, and they spent most of the evening together. Hogroe testified similarly. Each testified that they were not intoxicated or feeling the effects of alcohol when they left Bogies.

The only evidence adduced at trial to contradict Haskins', Roberts' and Hogroe's testimony about the amount of alcohol Haskins had consumed that night came from Timothy Denton, the Denny's restaurant manager. Denton testified that when he attended to Haskins after the shooting, he detected the odor of alcohol on Haskins' breath. Denton offered his lay opinion that Haskins was intoxicated. The prosecution undermined Denton's opinion by suggesting that Denton may have confused intoxication with shock.

After the shooting, Haskins was taken to the hospital for emergency treatment. While at the hospital, numerous blood tests were run, including a blood-alcohol test that established that Haskins' blood-alcohol level at the time of the shooting was at least 0.186 percent. During preparation for petitioner's trial, the prosecution subpoenaed Haskins' medical records to the court with a copy to the District Attorney's file, but never made them available to the defense, and they were not introduced at trial. Petitioner has submitted unchallenged expert medical testimony that based upon his blood-alcohol level, Haskins must have consumed at least seven hard alcohol drinks, or ten beers, or six and a half six ounce glasses of wine the night of the shooting.

### C. The Out Of Court Statement Of Ho.

On July 18, 1995, during presentation of the prosecution's evidence, petitioner's trial counsel informed the court that during the defense's case he intended to present evidence of tape recorded statements by Ho in which Ho admitted to Maggie Cheung, petitioner's wife, that he, not petitioner, was the shooter at the Emeryville Denny's on the night of February 1, 1995. The court ad-

vised counsel that the fact that the tape recording was made without Ho's knowledge or consent did not necessarily preclude its admission, but alerted counsel to procedural hurdles for its admissibility as a statement against the declarant's interest. The court further advised him that the burden of proving unavailability was on him and that so far he had not met his burden.

On July 24, 1995, the court again addressed the question of the admissibility of Ho's out-of-court statement. Petitioner's attorney stated that he had not been aware that a showing of Ho's unavailability was a prerequisite to the admissibility of Ho's statements because serving Ho with a subpoena to come to court and admit a crime would so clearly be futile. Petitioner's attorney then outlined his recent efforts to find Ho which consisted of the following:

I have made three attempts. One last week, Wednesday from 11:00 p.m. to approximately midnight. Also on Friday from 11:00 p.m. to approximately 12:30. At that time I was accompanied by a bilingual individual and also had a subpoena and a photograph. I went alone on Saturday from about 11:00 through 1:30, at the Billiards Palacade (Phonetic) on Mission Street in San Francisco, the last known whereabouts of Mr. Ah Ho .... I also left my card with the, I think he is the manager, and showed him a photograph of the individual that I had in my possession and instructed him to call me if he ever saw him. RT 813–815.

Petitioner's attorney then advised the court that the taped conversations were in Cantonese and had never been translated. Petitioner's attorney presented neither a tape or a transcript to the court, made no formal proffer as to what Ho had actually said to Maggie Cheung, and did not request to lay a foundation for the admissibility of Ho's statements by calling Maggie Cheung to testify outside the presence of the jury. On this record, the court ruled during the trial that the defense had satisfied none of the procedural prerequisites for admissibility of the tape.

Maggie Cheung was available throughout the proceedings to testify to lay a foundation

for Ho's statements, and she did in fact testify on other matters. In connection with the motion for a new trial on the grounds that trial counsel was ineffective, the parties stipulated to Ho's unavailability. By that time the tapes had also been translated. The transcripts of the tapes reflect that during the conversation between Maggie Cheung and Ho, Ho admitted to Maggie that he, not petitioner, had shot Haskins. Ho explained that there were three black people present, two men and one woman, that the two men followed them outside, and that one of the men used petitioner as a shield to block gun fire. Ho also told Maggie that one of the black men was shot. The trial court nevertheless found that trial counsel had not acted ineffectively, and declined the motion for a new trial.

### D. The Pre–Trial Identification.

Haskins, Roberts and Hogroe each participated individually in a photographic line up several days after the shooting. Officer Sinclaire administered the line up at each person's residence. The line up included a photograph of petitioner, but not of Woon, Lei or Ho, petitioner's companions that night. During the line up, Haskins identified the photo of petitioner, but said the shooter's hairstyle looked more like the person in photo number 4. Roberts stated that petitioner looked most like the person who acted as the peacemaker that night, but with a different hair style. Hogroe identified someone other that the petitioner as looking most like the shooter.

On March 24, 1995, the three witnesses attended an in-person line up together. Petitioner was number 4. The police permitted all three to observe the line up simultaneously in the same room. Hogroe audibly stated "Number 4" or words to that effect. Roberts initially indicated that the individual in position 2 looked most like the peacemaker, although she was not certain. Roberts later explained that she really thought that petitioner was the peacemaker but that she did not select him because she did not want to appear to have been influenced by Hogroe's comment. Both Hogroe and Haskins stated that petitioner looked most like the shooter, although they could not be positive.

### E. Petitioner's Claims.

Petitioner makes the following claims in his petition for habeas corpus: a violation of *Brady v. Maryland* based on the government's failure to disclose Haskins' medical records which contained his blood-alcohol level, ineffective assistance of counsel based on the failure of trial counsel to investigate Haskins' medical records and his state of intoxication, ineffective assistance of counsel based on the failure of trial counsel to introduce Ho's out of court statements, and ineffective assistance of counsel based upon trial counsel's failure to object to the admission into evidence of Roberts' and Hogroe's pre-trial identification of petitioner.

## II. STANDARD OF REVIEW

Title 28 U.S.C. section 2254 governs habeas petitions by state prisoners challenging their state court convictions. A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). As the court of appeal reviewed and denied petitioner's claims on the merits, the Court must determine whether the state court's adjudication of each claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law.

## III. DISCUSSION

### A. The Blood–Alcohol Evidence Claims.

#### 1. The *Brady* Claim.

 "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punish-

ment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Neither the prosecutor's good faith nor actual awareness (or lack thereof) of exculpatory evidence in the government's hands is determinative of the prosecution's disclosure obligations. *See Carriger v. Stewart,* 132 F.3d 463, 479 (9th Cir .) (en banc), *cert. denied,* —— U.S. ——, 118 S.Ct. 1827, 140 L.Ed.2d 963 (1998); *United States v. Kearns,* 5 F.3d 1251, 1254 (9th Cir.1993). Rather, the prosecution has a duty to learn of any exculpatory evidence known to others acting on the government's behalf, including the police. *See Kyles v. Whitley,* 514 U.S. 419, 437–38, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Because the prosecution is in a unique position to obtain information known to other agents of the government, it may not be excused from disclosing what it does not know but could have learned. *See Carriger,* 132 F.3d at 480.

■ By its terms, *Brady*'s holding was limited to cases in which the defendant made a request for the suppressed evidence. In *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), however, the Supreme Court held that the failure to disclose *material and favorable* evidence will violate due process even when the defendant makes no request for the evidence. *See also United States v. Bagley,* 473 U.S. 667, 675, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (concluding that *Brady* requires disclosure by the government of material and favorable impeachment evidence). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley,* 514 U.S. at 433–34, 115 S.Ct. 1555. "A 'reasonable probability' of a different result is [ ] shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.' " *Id.* at 434, 115 S.Ct. 1555 (citing *Bagley,* 473 U.S. at 678, 105 S.Ct. 3375). As the Supreme Court explained,

[a] defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not be enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evi-

dentiary basis to convict. One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

*Kyles,* 514 U.S. at 434–35, 115 S.Ct. 1555. Here, the defense did not request the evidence, so in order to state a cognizable due process violation, the evidence must be both material and favorable. *See Agurs,* 427 U.S. at 110, 96 S.Ct. 2392.

The trial court and the court of appeal found that the failure to disclose the medical records to defense counsel was harmless. Both courts reasoned that because the defendant was able to present a "defense" of intoxication through the testimony of the manager at Denny's that he smelled alcohol on the alleged victim's breath, the defendant was not prejudiced, and thus the blood-alcohol level evidence was not material. The Court concludes that the state courts' holding that the blood-alcohol level evidence was not material is an unreasonable application of clearly established federal law.

### a. The evidence is material.

■ The Court finds that there is a reasonable probability that had the blood-alcohol level evidence been disclosed the result of the trial would have been different. Haskins' identification of petitioner as the shooter was crucial to the prosecution's case; he was the only witness at trial to positively identify petitioner as the shooter. The only other trial witness to identify petitioner, Hogroe, testified that he identified petitioner as the shooter during a photographic line-up. Hogroe's trial testimony was impeached, however, by Officer Sinclaire, the officer who administered the photo line-up. *Officer Sinclaire testified that Hogroe identified another person as the shooter during the photographic line-up.*

None of the other witnesses could positively identify petitioner as the shooter. Roberts, Haskins' girlfriend, identified petitioner only as the peacemaker during the initial confrontation at Denny's. Her testimony, in

fact, is consistent with petitioner not being the shooter. The restaurant hostess, Sherill Pineda, testified merely that she saw petitioner exit the restaurant followed by two African American men. The waitress, Rosemary Gaines, testified only that petitioner was one of the group of four Asian American men she waited on that night. Both women testified that upon hearing the first gun shot they fled to the back of the restaurant. No other witness testified as to the identity of the shooter. Thus, Haskins was the only witness to positively identify petitioner as the shooter. Petitioner's guilt boiled down to the testimony of Haskins versus the testimony of Woon that Ho was the shooter.

The prosecution recognized that Haskins' credibility was the key to its case. During closing arguments the prosecution admonished the jury that it need only believe Haskins' testimony in order to convict petitioner. Yet the jury was never given the opportunity to consider evidence of Haskins' credibility, his blood-alcohol level, even though introduction of scientific medical evidence of his state of intoxication may have created a reasonable doubt about his identification of the petitioner as the shooter.

The evidence bore directly on Haskins' credibility for several reasons. The shooting occurred around 2:30 am in the artificially lit parking lot of a Denny's restaurant. The shooting involved two groups of complete strangers. Neither Haskins nor any of his companions had ever met petitioner and his companions before that night. Scientific medical evidence that Haskins' blood-alcohol level was more than twice the legal limit for driving would have cast doubt on Haskins' ability to identify petitioner, especially under those circumstances.

Moreover, Haskins testified that he had only sipped his girlfriend's strawberry daiquiri that night, and had had nothing else alcoholic to drink. The medical report showing that Haskins' blood-alcohol level was .186 percent at or around the time of the shooting undisputably contradicts that testimony. Indeed, petitioner has offered unchallenged expert medical testimony that based upon his blood-alcohol level, Haskins must have consumed at least seven hard alcohol drinks, or ten beers, or six and a half six ounce glasses of wine. The government has not argued,

and the Court cannot find, that there is any way Haskins' testimony can be reconciled with the undisputed evidence of his blood-alcohol level. If the jury had known that Haskins lied about his alcohol consumption, it may have been less likely to believe his identification of petitioner. See U.S. v. Steinberg, 99 F.3d 1486, 1491 (9th Cir.1996) (holding that the withholding of evidence which impeached the credibility of a government witness where that witnesses testimony was critical undermined the confidence in the verdict so as to meet the Brady standard).

The medical evidence also bears on the credibility of Roberts and Hogroe. Roberts testified that she and Haskins had spent most of the evening together and that he had only shared her drink with her, and had not had anything else to drink. Hogroe testified similarly. Again, their testimony cannot be reconciled with the undisputed medical evidence.

The Court disagrees with the state court's conclusion that because one lay witness, the Denny's manager, testified that he thought Haskins was intoxicated, petitioner was not prejudiced by the lack of scientific evidence of Haskins' state of intoxication. Denton's opinion was based solely on his perception of Haskins after the shooting. It was not based upon having personally witnessed Haskins consume any alcoholic drinks. It is thus unlikely that a jury would have believed Denton in light of Haskins', Roberts' and Hogroe's testimony that Haskins had not been drinking. This is especially so given that the prosecution actually argued that Denton was mistaken and may have confused intoxication with shock. The prosecution could not have made that argument if the jury had been presented with evidence that Haskins had at least a .186 percent blood alcohol-level at the time of the shooting, evidence that was in the government's file. Production of scientific evidence directly contradicting Haskins' testimony would have had a much greater effect on the jury than the lay opinion of the Denny's manager that he smelled alcohol on Haskins' breath.

#### b. The evidence is favorable.

For the same reasons the evidence is material, the evidence is clearly favorable.

### c. There was a *Brady* violation.

*Brady* and it's progeny require the government to disclose material and favorable evidence to the defense. Here, the evidence of Haskins' blood-alcohol level was both material and favorable to the defense and it is undisputed that the government did not disclose it. The state court's conclusion that the evidence was not material was contrary to clearly established federal law as determined by the United States Supreme Court. Accordingly, the prosecution's failure to disclose the medical records violated petitioner's right to due process of law under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

### 2. The *Strickland* Claim.

■ If petitioner can show that he was denied effective assistance of counsel under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), he also will show that the state court decision was contrary to clearly established federal law as determined by the United States Supreme Court. *See Baylor v. Estelle,* 94 F.3d 1321, 1325 (9th Cir.1996), *cert. denied,* 520 U.S. 1151, 117 S.Ct. 1329, 137 L.Ed.2d 489 (1997).

■ A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel. *See Strickland v. Washington,* 466 U.S. at 686, 104 S.Ct. 2052. The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *See id.*

■ First, the defendant must show that counsel's performance was deficient. This requires an evidentiary showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. *See Strickland,* 466 U.S. at 687, 104 S.Ct. 2052; *Toomey v. Bunnell,* 898 F.2d 741, 743 (9th Cir. 1990). The petitioner must show that counsel's representation fell below an objective standard of reasonableness. *See Strickland,* 466 U.S. at 688, 104 S.Ct. 2052. The relevant inquiry is not what defense counsel could

have done, but rather whether the choices made by defense counsel were reasonable. *See Babbitt v. Calderon,* 151 F.3d 1170, 1173 (9th Cir.1998). Judicial scrutiny of counsel's performance must be highly deferential, and a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *See Strickland,* 466 U.S. at 688, 104 S.Ct. 2052.

■ Second, the defendant must show that counsel's errors were so serious as to prejudice the defendant, that is to deprive the defendant of a fair trial. *See Strickland,* 466 U.S. at 688, 104 S.Ct. 2052. The test for prejudice is not that the counsel's error was outcome-determinative. However, a simple showing that the defense was impaired is also not sufficient. *See id.* at 693, 104 S.Ct. 2052. The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *See id.* at 694, 104 S.Ct. 2052.

### a. Failure to provide competent representation.

■ A claim of negligence in conducting pretrial investigation can form the basis for a claim of ineffective assistance. *See United States v. Tucker,* 716 F.2d 576 (9th Cir.1983); *Hines v. Enomoto,* 658 F.2d 667, 676 (9th Cir.1981). Counsel must, at a minimum, conduct a reasonable investigation enabling him to make informed decisions about how best to represent his client. *See Sanders v. Ratelle,* 21 F.3d 1446, 1457 (9th Cir. 1994). Here, the state appellate court did not address whether defense counsel's failure to investigate Haskins' medical records was incompetent. Instead, that court rested its decision on a lack of prejudice to petitioner.

■ The Court concludes that defense counsel's failure to investigate Haskins' medical records amounts to incompetence under the first prong of *Strickland.* Although trial counsel did not know that the medical records had been subpoenaed by the prosecution and a copy was provided to the court, he should have known that the medical records

might contain further information on the state of Haskins' intoxication, or other information which would bear on his credibility. Trial counsel was on notice of the possibility of intoxication through Denton's testimony, yet still failed to investigate further any information regarding Haskins' state of intoxication. Moreover, the allegations against petitioner included great bodily injury. A reasonable attorney would have realized that Haskins' hospital records would be relevant to these allegations. Additionally, the records could disclose prior inconsistent statements, and any of the victim's statements concerning recent drug or alcohol consumption. In sum, petitioner's attorney should have at a minimum inquired into any medical records at the hospital.

The Court's conclusion is supported by the Ninth Circuit decision in *Baylor v. Estelle*, 94 F.3d at 1321. In *Baylor*, a criminalist's report testing certain evidence tended to eliminate the defendant as the suspect, yet the trial counsel never followed up on the information in the report. Nor did counsel have another test conducted when he realized he could not subpoena the criminalist who tested the evidence. Since the criminalist did not testify, the report was inadmissible. The jury convicted the defendant on the basis of a taped confession (which he recanted during trial). *Id.* at 1323. The Ninth Circuit upheld the district court's finding that the trial counsel's performance was "completely inadequate." *Id.* at 1324. The facts here are even more compelling than in *Baylor*. There, the attorney knew of the report and its conclusions, and the attorney tried to subpoena the criminalist, tried to get the report in anyway, and discussed continuation of the trial with his client. *Baylor*, 94 F.3d at 1323. Here, in contrast, petitioner's trial counsel never bothered to obtain or review Haskins' medical records in the first place, even though a reasonable attorney would have known such records could relate directly to many aspects of the case.

### b. Prejudice.

The trial court and court of appeal found *no ineffective assistance of counsel* because all the defenses that petitioner could have presented to the jury on the basis of the medical records of Haskins' blood-alcohol lev-

el were presented to the jury through the testimony of the Denny's manager that he could smell alcohol on Haskins' breath and rejected. The court of appeal thus concluded that petitioner was not prejudiced by the failure of defense counsel to ascertain and introduce the medical records. The Court disagrees.

Petitioner was prejudiced by the failure of his counsel to present evidence of Haskins' blood-alcohol level for the reasons stated, *supra*, in the context of the *Brady* violation. There is a reasonable probability that the blood-alcohol level evidence that would have been presented but for counsel's ineffective assistance would have injected reasonable doubt into the jurors' mind as to petitioner's guilt.

### B. The Claim Involving Ho's Statement.

 Petitioner also asserts that trial counsel was ineffective because he failed to adequately investigate the facts and law as they related to petitioner's defense that Ho, not he, shot Haskins and fired at Hogroe, and in particular, trial counsel's failure to admit into evidence Ho's tape-recorded admission. In *Sanders v. Ratelle*, 21 F.3d at 1457, the Ninth Circuit held that defense counsel was inadequate for failing to investigate exonerating statements of a confessing individual and or failing to seek admission of those statements as utterances against penal interests. Similarly, in *Jones v. Wood*, 114 F.3d 1002 (9th Cir.1997), the Ninth Circuit held that counsel was ineffective for failing to investigate a potential suspect for a murder for which his client was charged. *Id.* at 1010–1011. Petitioner contends that here, too, counsel inexplicably failed to investigate Ho and to present available statements by Ho that he, not petitioner, had committed the offense with which petitioner was charged, and that under *Sanders* and *Jones* counsel's failure amounts to ineffective assistance of counsel. The government argues that even if defense counsel's failure to present evidence of Ho's admission at trial amounted to ineffective assistance of counsel, petitioner's claim must fail because petitioner cannot show prejudice. Here, unlike *Sanders* and *Jones*, the government argues, the state

court specifically found that the confession was inadmissible. The Court will first address whether defense counsel's conduct amounted to ineffective assistance, and second whether petitioner has shown prejudice.

### 1. Failure to provide competent representation.

Before and throughout the trial, petitioner's attorney was in possession of tape-recorded conversations between Maggie Cheung, the petitioner's wife, and Ho, in which Ho admitted that, he, not petitioner, was the shooter. Although the conversations between Cheung and Ho were completely in Cantonese, petitioner's attorney, never had them translated. Trial counsel did not attempt to compel Ho to appear, and when his efforts to even locate Ho were unsuccessful, he made no serious effort to introduce his statements under the applicable hearsay exception. Trial counsel admitted that he failed to act earlier because of his mistaken belief that Ho would be deemed unavailable within the meaning of Section 1230 and Section 240 because the court would assume that Ho would assert his Fifth Amendment privilege if called to testify. A reasonably competent attorney must know the statutory prerequisites for the admissibility of the evidence he wishes to present. The Court concludes that trial counsel's conduct was unreasonable and incompetent. Thus, petitioner has satisfied the first prong of *Strickland.*

### 2. Prejudice.

To demonstrate prejudice petitioner must show that, "there is a reasonable probability that, absent [trial counsel's] errors, the fact finder would have had a reasonable doubt respecting [his] guilt." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. Petitioner does not need to show that trial counsel's defective conduct more likely than not altered the outcome of the case, as the "preponderance" standard was rejected in *Strickland. Id.* at 693, 104 S.Ct. 2052. Rather, a "reasonable probability" is a "probability sufficient to undermine confidence in the outcome" of petitioner's trial. *Id.* at 695, 104 S.Ct. 2052. The government contends that petitioner cannot demonstrate prejudice because the state court found that Ho's confession was inadmissible under state law.

### a. The state court did not find that Ho's statement was inadmissible under state law.

■■■ When reviewing a habeas petition, a federal court is bound by a state court's resolution of state law matters. *See Clark v. Groose,* 16 F.3d 960, 963–64 (8th Cir.1994); *see, e.g., Williams v. Calderon,* 52 F.3d 1465, 1480–1481 (9th Cir.1995). Thus, this Court must first look to the record to determine whether the trial court or appellate court made a finding that Ho's statements did not meet the standard required for admission under California Evidence Code section 1230. The appellate court stated, "[the trial court] found that Cheung did not establish that the evidence of Ho's taped confession admitting that he was the perpetrator of the crimes would have been admitted at trial." The appellate court went on to review for abuse of discretion the trial court's conclusion "that the Ho statement and Maggie Cheung's testimony about it lacked sufficient indicia of trustworthiness to make it admissible as a declaration against interest." Thus, the appellate court deferred to findings which it *assumed* were made by the trial court. Under these circumstances, the Court must therefore examine whether the trial court found that the statements, properly translated, were still inadmissible. When deciding petitioner's motion for a new trial the trial court made the following finding:

[T]here was not ineffective assistance of counsel. Though the evidence that Mr. Cassman has referred to is not speculative, it's evidence which we still don't know whether or not it would ever be admitted. I have in my purported statement of Ho, in the trial itself, we got as far as the question of unavailability. The court ruled there was no showing he was unavailable. We still have the problem of proving the question of credibility of the statement, itself, and assuming that the tape, itself could be validated. As to the other evidence of the blood alcohol test as to the victim Haskins, we don't know whether or not that is admissible, because we don't know how the test was demonstrated, or what effect it would have. The ruling upon the fact there was not an ineffective assistance of counsel, basically because the

defenses were all presented in the trial, itself. The jury merely came to a result different than the defendant anticipated. Merely because the defendant lost, I don't think you can claim ineffective assistance of counsel ... and I feel that the standard that the defense attorney in the case met is the standard of legal competency in the county. So the motion for new trial is denied.

RT 991–992. The trial court found only that there was no ineffective assistance of counsel. The court never found that based on the new information, including a stipulation as to Ho's unavailability and an English translation of Ho's conversation with Maggie Cheung the statement was inadmissible. In these circumstances, the Court is not bound by the findings of the state court since none were ever made. *Cf. Sanders*, 21 F.3d at 1459 n. 14. Thus, the Court must evaluate whether the failure of petitioner's counsel to have Ho's statement admitted prejudiced petitioner.

**b. Ho's statement could have been admitted under the hearsay exception for statements against penal interest.**

 In order to have Ho's statements admitted as an exception to hearsay, the requirements of California Evidence Code section 1230 must be met. Under the exception to the hearsay rule for statements against penal interest, Ho's out-of-court statements were admissible in evidence if 1) he was unavailable, and 2) his statements "so far ... subjected him to the risk of civil or criminal liability ... that a reasonable man in his position would not have made the statement unless he believed it to be true." Cal. Evid.Code § 1230 (West 1998). In order to be deemed unavailable for the purposes of Section 1230, the requirements of California Evidence Code section 240 must be met. Under Section 240, unavailability is a question of fact that must be evaluated on a case-by-case basis. *See People v. Saucedo*, 33 Cal.App.4th 1230, 1236–1239, 40 Cal. Rptr.2d 153 (1995). Here, however, the parties have stipulated to Ho's unavailability.

 As to the second requirement of Section 1230, the facts and circumstances in the record demonstrate that Ho's confession was substantially against his penal interest and would almost certainly have subjected him to a significant risk of serious criminal liability. To determine whether a declaration passes the required threshold of trustworthiness, "the court may take into account not just the words but the circumstances under which they were uttered." *People v. Frierson*, 53 Cal.3d 730, 745, 280 Cal.Rptr. 440, 808 P.2d 1197 (1991). Additionally, it is not "reasonably disputable that a statement confessing to a killing ... subjects the declarant to a risk of criminal liability and therefore on its face is against the alleged declarant's penal interest." *People v. Cudjo*, 6 Cal.4th 585, 607, 25 Cal.Rptr.2d 390, 863 P.2d 635 (1993).

The translated transcript of the conversation supports its credibility. The statement by Ho itself contains information which would only be known to a person who was present that night at Denny's. For example, Ho states the fact that three black people were present, two males and one female, one of the men held petitioner as a shield, and that the victim fell back into the restaurant after being shot. Additionally, as the Ninth Circuit reasoned in *Sanders*, the confession's credibility is greatly enhanced by the fact that Ho's clear admission that he was the shooter subjected him to a substantial risk of criminal liability, with most serious consequence. 21 F.3d at 1457–1459. Ho's express reluctance to come forward to the police and to give Maggie Cheung a direct means of contacting him further indicate that Ho knew that his admission was contrary to his penal interest.

**c. Petitioner has shown prejudice.**

Trial counsel's failure to establish Ho's unavailability, to translate Ho's statement and to otherwise take the steps necessary to have it admitted into evidence undoubtedly prejudiced petitioner. Trial counsel's incompetence served to deprive petitioner of the most critical evidence in his favor—evidence that another individual present at Denny's that night committed the crime for which petitioner has been convicted. Given the fact that the prosecution's case relied primarily on Haskins' identification of petitioner, it

cannot be said with "fair assurance" that had the jury heard Ho's statement it would still have convicted petitioner, especially in light of the fact that another witness, Woon, identified Ho as the shooter. *See Sanders* 21 F.3d at 1457–1459. Thus, the state court's adjudication of petitioner's claim resulted in a decision that was contrary to clearly established federal law.

## C. The Pre-Trial Identification Claims.

 "Suggestive pretrial identification procedures may be so impermissibly suggestive as to taint subsequent in-court identifications and thereby deny a defendant due process of law." *United States v. Bagley*, 772 F.2d 482, 492 (9th Cir.1985). The likelihood of misidentification is what may violate a defendant's due process rights. *See Neil v. Biggers,* 409 U.S. 188, 198, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). Identification testimony is inadmissible as a violation of due process only if (1) a pretrial encounter is so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification, and (2) the identification is not sufficiently reliable to outweigh the corrupting effects of the suggestive procedure. *See Van Pilon v. Reed,* 799 F.2d 1332, 1338 (9th Cir.1986). Unnecessarily suggestive pretrial identification procedures alone do not require exclusion of in-court identification testimony: reliability is the linchpin in determining the admissibility of identification testimony. *See Manson v. Brathwaite,* 432 U.S. 98, 100–14, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977).

Petitioner argues that trial counsel's failure to request that the pre-trial identification by Hogroe of petitioner as the shooter and the pre-trial identification by Roberts of petitioner as the peacemaker be excluded amounted to ineffective assistance of counsel because the identification procedure was unduly suggestive and allowed for a substantial likelihood of misidentification. In other words, the conduct of petitioner's trial counsel was unreasonable and fell below the standard articulated in *Strickland* because he did not object to the evidence on the basis that it violated due process, and petitioner was prejudiced by this evidence because it amounted to a misidentification.

### 1. Hogroe's pretrial identification.

During the photographic line-up Hogroe could not identify petitioner as the shooter, and he, in fact, selected another person's photo as the shooter. He also signed a statement for the police that stated that he did not recognize any of the photographs. Nevertheless, Hogroe testified without objection from defense counsel that he had recognized petitioner's photograph in the line-up. A police witness later testified that Hogroe did not identify petitioner at the line-up and Hogroe's signed statement that he did not recognize any of the photographs admitted into evidence.

 Trial counsel's failure to object, however, may have been a strategic decision. By allowing Hogroe to testify falsely, counsel set him up to be impeached by the police witness. A difference of opinion as to trial tactics does not constitute denial of effective assistance, *see United States v. Mayo,* 646 F.2d 369, 375 (9th Cir.), and tactical decisions are not ineffective assistance simply because in retrospect better tactics are known to have been available. *See Bashor v. Risley,* 730 F.2d 1228, 1241 (9th Cir.); *United States v. Gibson,* 690 F.2d 697, 703–04 (9th Cir. 1982) (failure to make evidentiary objections does not render assistance ineffective unless challenged errors can be shown to have prejudiced the defense). Thus, trial counsel's conduct does not meet the first prong of *Strickland.*

Even if trial counsel's conduct was deficient enough to meet the first prong of *Strickland,* petitioner cannot show the required prejudice. The police witness testified that Hogroe did not select petitioner as the shooter. Hogroe's own signed written statement, shown to the jury, contradicted his testimony and supported the police witness. Although there may be some prejudice from the inconsistencies, it does not rise to the level required by *Strickland.*

### 2. Roberts' pre-trial identification.

 Petitioner also challenges as ineffective assistance of counsel, trial counsel's failure to move to exclude Roberts' identification of petitioner during the physical line-up.

Whether this failure was prejudicial turns on whether her identification was sufficiently reliable so that it did not violate petitioner's right to due process of the law. *See Manson,* 432 U.S. at 100–14, 97 S.Ct. 2243. In determining whether in-court identification testimony is sufficiently reliable, courts consider five factors: (1) the witness's opportunity to view the defendant at the time of the incident; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description; (4) the level of certainty demonstrated by the witness at the time of the identification procedure; and (5) the length of time between the incident and the identification. *See Manson,* 432 U.S. at 114, 97 S.Ct. 2243; *Neil,* 409 U.S. at 199–200, 93 S.Ct. 375.

▆▆ Petitioner contends that the physical line-up procedure was unduly suggestive because the police chose to permit Haskins, Roberts and Hogroe to observe the line-up simultaneously. Also, during the line-up Hogroe said out loud which person was petitioner. Roberts testified that she selected position number 2 to demonstrate that she was not influenced by Hogroe. Petitioner argues that given Hogroe's inability to select petitioner from the photographic line-up, and his willingness to lie about it, the finder of fact could infer that Hogroe spoke out the number in order to assure that he and Haskins selected the same person. Thus, according to petitioner, the entire procedure was improper, and Roberts' pre-trial identification should have been excluded.

The court of appeal concluded that the facts of this case supported a conclusion of reliability. In reaching its conclusion, the court looked at the fact that Roberts identified petitioner in the photographic line-up as the peacemaker, that in court she explained her choice in the physical line-up was made to avoid appearing influenced, and that she identified petitioner in trial as the man she saw at Denny's on the night of the shooting. Additionally, the court considered the fact that Roberts had spoken with petitioner that night at Denny's, thus having opportunity to view petitioner at the time of the incident. The fact that the line-up occurred approximately seven weeks after the incident does not make it so remote in time as to be unreliable. In addition, Roberts did not

identify petitioner as the shooter, she merely identified him as the man she saw at Denny's and the person who acted as the peacemaker. Her identification of petitioner was sufficiently reliable, and non-prejudicial to avoid a due process violation. Thus, the state court's ruling did not result in a decision that was based on an unreasonable application of clearly established federal law

## IV. CONCLUSION

In sum, the Court concludes that the failure of the government to disclose Haskins' blood-alcohol evidence amounts to a violation of due process under *Brady v. Maryland;* the failure of trial counsel to discover the blood-alcohol level evidence and introduce it at trial amounts to ineffective assistance of counsel under *Strickland v. Washington;* the failure of trial counsel to introduce into evidence Ho's out-of-court statement also amounts to ineffective assistance of counsel.

For the foregoing reasons, this petition for writ of habeas corpus is hereby GRANTED. Accordingly, the conviction and sentence of petitioner for violations of California Penal Code Sections 192(a) and 245(a)(2) are vacated and set aside. The State of California shall determine whether petitioner is to be retried on these charges within thirty (30) days of this order.

**IT IS SO ORDERED.**